CHARLES HOLBEIN ET AL., APPELLANTS, v. WILLIAM HOLBEIN ET AL., APPELLEES.

30 N. W. 2d 899

Filed February 13, 1948. No. 32291.

*Smith Bros.,* for appellants.

*W. A. Stewart, Jr.,* for appellees.

Heard before SIMMONS, C. J., PAINE, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ., and WESTERMARK, District Judge.

PAINE, J.

This is an action to quiet title to 80 acres of land, brought by two sons and the heirs of two deceased sons of Christian Holbein, deceased, against William Holbein, the eldest son of Christian Holbein, the respective spouses being also made parties. The trial court quieted title to the land in the defendants and dismissed the petition of the plaintiffs, who have appealed.

It is alleged that Christian Holbein died December 17, 1910, intestate, and at the time of his death was the owner of an equitable title in the west half of the northwest quarter of Section 32, Township 9 North, Range 23 West, of the Sixth Principal Meridian, in Dawson County; that his widow, Barbara Holbein, died intestate November 17, 1917; that their estates were administered except as to the 80 acres above set out; that the above described land was purchased March 23, 1906, from Adaline Hitchcock, a widow, the deed being made to William Holbein, but it is alleged that the money was

paid by Christian Holbein. It is further alleged that it was the intention of William and his father, Christian, that William should have no interest in said land, but should convey said land to the heirs of Christian Holbein upon his death, and it should be held in trust for that purpose; that William recognized the existence of the trust by asking three of his brothers on March 2, 1922, for a few years' extension of time before dividing up the land; that during the lifetime of his father, Christian, and after his death during the lifetime of his mother, Barbara, and up to and including 1922, William paid rent upon said land, first to his father, then to his mother, then to the heirs-at-law of his father and mother; that the first knowledge the plaintiffs had that William held himself out to be the owner of the land was on February 20, 1936, when he and his wife conveyed the premises to themselves as joint tenants with the right of survivorship, and that said deed, made without consideration, was for the purpose of depriving the plaintiffs of their interest in said land; that at various times William promised his brothers to divide the land at some future date; that originally the heirs of Christian and Barbara Holbein were their five sons, William, Robert, Gottlieb, Gottlob, and Charles; and that at the time of the filing of this petition William, Charles, and Robert each owned an undivided one-fifth interest in the land, another one-fifth interest was owned by the heirs of Gottlieb Holbein, and the last one-fifth interest was owned by the heirs of Gottlob Holbein, deceased, all of such heirs being made parties plaintiff. The plaintiffs prayed for a judgment quieting the title in the owners described in the petition and that an accounting be had for the rents and profits.

The defendants, William Holbein and his wife, Louise, in their answer denied specifically the allegations of the petition not admitted, and alleged that on March 23, 1906, defendant William Holbein purchased the land described in the petition from Adaline Hitchcock for

$5,460, received a warranty deed on said date, and filed the same; that William Holbein paid $1,000 cash, for which he received a seller's receipt, and executed a mortgage for the premises, securing several notes payable annually; and that all of said mortgage notes were paid in full, with interest, by him, and on May 18, 1908, said mortgage was released. Defendants further alleged that they have resided upon the premises since its purchase, claiming to own it, enclosing it with fences, placing valuable improvements thereon, have farmed and cultivated it, and paid all taxes thereon since the purchase thereof.

The defendants denied that their father, Christian, and their mother, Barbara, ever had any right, title, or interest to said premises, and specifically denied that the plaintiffs, or any of them, had any right, title, or interest therein, either legal or equitable. The defendants further alleged that the plaintiffs and each of them have been guilty of laches; that their right and claim to the premises have become stale; and their right, if any they had, has been barred by the lapse of time.

For a reply the plaintiffs alleged that they relied upon the promises of the defendant that he would perform his trust and divide the land between them. They further alleged that an attempt was made to settle the matter by filing an action on February 13, 1939, to partition the land, and that the petition herein was filed March 18, 1941, and because of this record the plaintiffs are not guilty of laches.

The court entered a decree in favor of the defendants, found that there was insufficient evidence to sustain plaintiffs' petition, that the defendants are the owners of a fee title to the 80 acres described in the petition, and quieted the same in the defendants.

The plaintiffs assigned as errors for reversal that the findings and judgment are contrary to the evidence and to the law, and that the court erred in admitting certain testimony of the defendants in evidence, which was

duly excepted to at the time by the plaintiffs. The plaintiffs relied entirely for reversal on the question whether the evidence sustained and justified the trial court in quieting the title to the 80 acres in dispute in the defendants.

The plaintiffs insist that Christian Holbein had an interest in the land from the day it was purchased, and while the title was taken in the name of his oldest son, William, yet he was simply to hold it in trust, and when the old man died the eighty was to be divided equally between the five sons. Plaintiffs insist that William always paid rent on this 80 acres and promised on several occasions to divide it.

Charles Holbein, a plaintiff, testified that from the time this 80-acre tract was purchased in 1906 the one-third rent portion was always taken across the road and put in the granary north of the road on the father's land; that this continued not only until the mother died in 1917, but continued until 1922; and out of this each brother received his one-fifth share.

Charles Holbein also testified that there was no time. at which his father, Christian, talked to him about the 80 acres when William Holbein was also present. He testified that a meeting was held at his father's place about a week after his father's death, when all of his brothers were there, and he was asked these questions: "Q Was there any talk, among your brothers, with reference to what you were to do about the northwest quarter of section 32, Township 9, Range 23? A No, there wasnt anything mentioned. * * * Q What was said and who said it, with regard to whether this quarter section, or any part of it, would be included in your Father's Estate? * * * A They didnt say much about the other, the other eighty in there, why he didnt put that in, he said, we will settle later on, on that; and that was Bill Holbein said that."

Charles testified that his brother William was appointed administrator of their father's estate; that upon the

closing of that estate he was given a power of attorney by the others; and that he opened a special "P. A. Account" in the Pioneer Bank, made deposits in it and payments out of it, and gave some to the mother and the balance to the brothers. He further testified that rent was always paid by William on the west 80 acres in suit here, but never on the east eighty, which was admittedly William's own land, and that was where all of his buildings were erected; that this rent account was settled in 1922, at G. C. Hueftle's office in Eustis one evening, and William stopped in at Charles' home on his way down, and said: "I will settle all the rest of the land, but I will hold this 80 acres back because-until I have the money in a few years and then I will pay each of you out in full; but he said, Bob wont get a damned cent of me, because he sued me." Charles testified that he repeated the same statement that evening in G. C. Hueftle's office, when his brothers Gottlieb and Gottlob, and Mr. Hueftle were there. Mr. Hueftle also testified to the same statement. Charles said that, in the administration proceedings instituted by Robert on his mother's estate, the 80 acres in dispute were included, and were also included in a partition suit that Robert started.

An examination of exhibit No. 2 shows that the petition filed by Robert in the estate of Barbara Holbein did include this 80 acres, by the statement, "the said Christ Holbein having died intestate, December 17th, 1910, owner of all of the above described real estate except the NW¼ of Sec. 32, Twp 9, Range 23, of which he died the owner of an undivided half interest; * * *." However, the decree in said estate proceedings omits all reference to this 80 acres.

An examination of the petition in the partition suit which was filed in Frontier County in February 1922 by Robert Holbein, one of the five sons, against his four brothers, shows that he alleged that his father, Christian, died intestate, the owner of the following tracts of

land: The north half of the southeast quarter of Section 1, Township 8, Range 24, in Frontier County; the southeast quarter of Section 29, and the southwest quarter of Section 32, all in Township 9, Range 23, in Dawson County; and also an undivided one-half interest in the northwest quarter of Section 32, Township 9, Range 23, in Dawson County. The west eighty of the last described quarter is the land in dispute. In this partition suit the plaintiff, Robert Holbein, alleged that the five brothers owned these lands in equal shares.

On April 18, 1922, Robert Holbein filed a dismissal of the partition case, in which he set out that the action had been settled by the heirs agreeing upon a division of the lands and executing and delivering deeds therefor, and said action was dismissed.

Robert's deposition was taken at Long Beach, California, January 3, 1947. He testified that the west 80 acres were not included in his partition suit, for he was asked this question: "Q In that settlement was the west 80 involved? A No." However, it appears that the west eighty was included in the partition petition as an undivided one-half interest in the northwest quarter of Section 32.

It is clear from the record that, whatever deeds may have been exchanged between the heirs on the balance of the property described in the petition of this partition suit, no deeds were exchanged on the 80 acres in dispute in the settlement of this partition suit.

Robert testified that, shortly after his father's death, in a talk among the brothers, "William said, we would leave it that way, and later on when we had a final settlement, he would straighten it out with the rest of the brothers."

Mrs. Ida Holbein, widow of Gottlieb Holbein, testified that when her husband was on his deathbed in a Holdrege hospital, William was there and several other men were present, "I asked him (William) about the

80 that we shared in, * * *. A Well, he said, that was all settled; * * *."

Many references are made to a statement of Christian Holbein back in 1906, and as the plaintiffs place much stress on this evidence we will set it out in some detail. The statement was reported by Charles Hausler, who may have been an unwilling witness in the case at bar.

During the trial of this case, on January 21, 1947, a motion was filed in which the plaintiffs moved the court to keep their case open, without resting, until the deposition of Charles Hausler of Eustis could be taken. Said motion recited that Charles Hausler was a material witness; that since the action was filed said Hausler had attended a conference with Charles Holbein and attorney Elbert H. Smith; that they had understood that he was willing to appear in court and testify on behalf of the plaintiffs, but that they had just learned that Charles Hausler had indicated that he would not leave Frontier County to appear and testify; that the plaintiffs could not safely try their case without his evidence; and they asked that they be permitted to take the deposition of Charles Hausler at Eustis at the earliest possible time.

In the bill of exceptions appears a stipulation that the counsel and the court reporter would go to Eustis to take the deposition of Charles Hausler, whose signature was waived and the signature of the notary was waived; and that the making of objections would be reserved until the reading of the deposition in court. "THE COURT: We will adjourn until tomorrow morning at nine oclock in order that Attorneys and the Reporter may go to Eustis and take the testimony of one of the Plaintiffs' Witnesses."

This witness, Charles Hausler, testified in his deposition that he was born in Germany in 1892. Christian Holbein had been over to Germany to visit and when he came back in January 1906 he brought Charles Hausler with him, who was distantly related to the family.

The evidence he gave was that different members of the family often gathered at the home of Christian Holbein on Sundays for a visit. On this particular Sunday afternoon in March 1906 a neighbor, William Keugler, was in the house visiting, and Christian sent Charles Hausler, who had been living with him, downstairs to bring up a pitcher of wine. Mr. Hausler was at that time a boy of 14 years of age, and he remembered this much of a statement by Christian Holbein: "All the Old Man says: If I buy that land we would take it together, but you would have to give me rent, but I dont know what they done afterwards."

Eight or nine times in his examination, the attorney for plaintiffs asked Mr. Hausler in different ways whether William Holbein was there on that Sunday afternoon. Each time witness Hausler definitely stated that William was not there, and finally the attorney asked the witness a question about a time when the witness was brought to his office by Charlie Holbein to talk over the case. "Q And at that time did you tell me that Mr. Bill Holbein was present at this talk? A No, I dont believe so, or I didnt suggest that, I know that Bill was not there. I am sure he was not there. Just Mr. Keugler and Mr. Holbein, and his wife was there, too."

Witness Hausler said that Bill Holbein never talked to him anything about this, but he believed that William and his father bought the land together. Hausler said he worked for Christian until 1908 and later on worked for William. Mr. Hausler testified that in March of 1906 he and Christian Holbein drove up in a spring wagon to William Keugler's to get $1,500 in gold; that Christian Holbein stayed there over night, but that he told the witness he should go home, and the 14-year-old boy walked home; that he does not know what the money was for; and that he never talked to Christian Holbein about the money after that.

This witness at the time of the conversation was only 14 years old, had been in the United States less than

three months, and was out of the room part of the time, so he did not hear all of the conversation, which was all in German, but he is positive that William was not present, and therefore on this occasion there could have been no agreement about a trust relationship on this land between the father and William. We cannot overlook the exact language that the father told his neighbor, "*If* I buy that land," and the proof is beyond dispute that the father did not buy it.

Defendant William Holbein testified in his own behalf that he rented the northwest quarter of Section 32, including the 80 acres in controversy, for one year before he bought it; that he had known Mrs. Hitchcock for some time before he bought this land of her, and had done a lot of work for her; that her daughter came out to visit her from Gresham, Nebraska; and that she wanted some money and urged her mother to sell the place for $5,600. William said he went down and told his father about it, but he hesitated about buying it, for it was all run down, and the place was full of cockleburrs, sunflowers, and timber. His father urged him to buy it. He said that William could buy the place; that he would help him and give him $500, and for him to go over to the bank at Eustis and borrow another $500; and that he would go his security on that $500 if he did. So on March 23, 1906, he bought the land, his father gave him $500, and Mrs. Hitchcock acknowledged the deed before W. A. Stewart, a notary public at Lexington, on that day. He testified that he paid her $1,000 the day he bought it, gave back a first mortgage securing four notes, earned the money and paid them all off, and on May 18, 1908, secured a release of the mortgage from Mrs. Hitchcock. He further testified that he paid off the $500 borrowed from the bank at Eustis. He moved on this quarter in March 1906, built valuable improvements, lived there some 40 years, and paid all the taxes on it during all those years.

Defendant William Holbein was examined in detail

as to why he paid one-third of the rent crop raised on this place from the time he bought it in 1906 until the settlement in 1922. We will set out here some of this evidence, as follows: On his direct examination, he was asked: "Q What is the fact as to paying rent on part of the land to your Mother? A I did, pay rent from the northwest corner, a strip on the east side. Q About how big a piece? A Right around 35 acres."

Again, on his cross-examination he was asked: "Q When did you pay your Father back the five hundred dollars? A I paid it back by giving him rent on the piece of ground on the west side; that is what he told me to do. Q By when did you have it paid back? A It took me a long while. I gave rent all the time for that, just off of that piece of ground, not on the 80. Q You mean, that you paid rent sixteen years? A Yes. Q In order to pay that five hundred dollars back? A Yes, it was up to me. I could pay more if I wanted to, nobody stopped me. What he gave me, I wanted to be sure to pay back. You understand, there was a lot of dry years in there, and I got hailed out; it was not all profit. * * * Q When your Father passed away in 1910, you kept on paying the rent? A Yes, I hadnt paid back the five hundred- not yet. Q And when your Mother passed away in 1917, you still kept on paying that? A Yes, I wanted the thing straightened up that is the reason I kept on."

It appears from the evidence that each of the sons received 80 acres when the father died, and an eighty apiece when the mother died; that the wheat from various tracts of land owned by each of the sons was mingled and sold together; and that the wheat from the 35 acres being tilled on the disputed 80 acres was put in with the rest.

William, the oldest son, with his power of attorney from the others, placed all funds from the sales in the Pioneer Bank, and signed all the checks in his name with "P. A." after it. Exhibit No. 4, introduced by plaintiffs,

consists of 15 typewritten pages and sets forth an itemized account of all the receipts and expenditures in this "P. A." account, prepared by the cashier of the bank. The first deposit was $28 on December 24, 1912, and the last deposit was $77.66 on February 21, 1922. Total deposits during those ten years were $26,875.36; total checks drawn, $26,105.04, leaving balance on hand, $770.32. It appears that William Holbein submitted this account and made a settlement thereof in a meeting in G. C. Heuftle's office in 1922.

In the evidence there are many reported statements by William and one statement was to the effect that in 1922 he said, in substance, I will settle with you boys on that eighty as soon as I can, but Bob won't get a cent for he brought that suit against me.

It is possible, of course, that William always had in mind the small balance due on the $500 he borrowed of his father and was slowly paying back out of rents on the small part of the eighty that was farmed, and that other relatives understood the whole eighty was to be divided. But other reported statements cannot be so resolved. So there is left this question to be decided from the conflicting evidence, which the trial court met by finding that there was not sufficient proof of any trustee relationship of any kind and by entering a decree quieting the title to the eighty in the defendants.

As to the law of the case, both parties in their briefs cite the court to the case of Reetz v. Olson, 146 Neb. 621, 20 N. W. 2d 687, in which it is said: "The law is well established in this state that when one person buys real estate and pays the purchase price thereof, and the title is taken for convenience in the name of another, the person taking the title will hold the property in trust for the person paying the purchase price."

"A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property

should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of." Restatement, Trusts, § 404, p. 1250.

"Although the term has been broadly defined as a trust which is raised or created by the act or construction of law, in its more restricted sense and contradistinguished from constructive trusts a resulting trust has been defined to be one raised by implication of law and presumed always to have been contemplated by the parties, the intention as to which is to be found in the nature of their transaction, but not expressed in the deed or instrument of conveyance. Such trusts are also called 'presumptive' trusts, and are frequently defined in terms of or in connection with the character of the transaction out of which they most frequently arise, namely, where one person pays the consideration for a purchase and the title is taken in the name of another, * * *." 65 C. J., Trusts, § 13, p. 222. See Bailey v. Dobbins, 67 Neb. 548, 93 N. W. 687; Doll v. Doll, 96 Neb. 185, 147 N. W. 471; Doll v. Doll, 99 Neb. 82, 155 N. W. 226.

"So reluctant are the courts to ingraft a trust by parol on the legal title to real estate, * * * that there is perhaps no better established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence." Annotation, 23 A. L. R. 1502.

As early as 1873, our court held in Roddy v. Roddy, 3 Neb. 96, that in order to fasten a trust on property the words employed must be clear and explicit. In Falsken v. Harkendorf, 11 Neb. 82, 7 N. W. 749, this court quoted: " 'Loose and equivocal facts ought not to control the evidence of deeds.' 1 Perry on Trusts, sec. 137."

In Klamp v. Klamp, 51 Neb. 17, 70 N. W. 525, we said: "The evidence in the case at bar was not only not satisfactory and conclusive in establishing such a

trust in favor of appellant, but was amply sufficient to warrant the conclusion of the trial court that all the property in controversy was the separate and individual property of appellee."

A little later this court made a full statement as to the proof required, and said: "It is obvious that what would ordinarily suffice may fall far short of the requisite *quantum* of proof in such a case, without in any degree infringing the general rule that only a preponderance of the evidence is demanded. In consequence, while we *we* may not admit the statements often to be seen in the books, that more than a preponderance of the evidence is required to establish a trust, contrary to the purport of a written instrument, by parol, and that the trust in such cases must be proved beyond doubt, there is no occasion to repudiate or to qualify what has become a commonplace of the books, that the proof in such cases must be clear, unequivocal and convincing." Doane v. Dunham, 64 Neb. 135, 89 N. W. 640.

"A resulting trust will not be declared upon doubtful and uncertain grounds; and the burden is upon the one claiming the existence of the trust to establish the facts upon which it is based by clear and satisfactory evidence." Veeder v. McKinley-Lanning Loan & Trust Co., 61 Neb. 892, 86 N. W. 882. See, also, Drake v. McDonald, 91 Neb. 775, 137 N. W. 863.

In the case at bar, we realize that two of the witnesses testified by deposition, and this court has the same record before it that the trial court had, but as to evidence of all the other witnesses we will quote from a recent opinion of this court: "The instant case is one of that class of cases in which an opportunity to both hear and see the witnesses as they testify places the trial court in a much better position to know the weight and credibility that should be given to the testimony than a reviewing court can possibly be from reading the transcript and bill of exceptions. This court tries

the case de novo, and yet we have said that, where the testimony of witnesses upon the vital questions involved is conflicting, this court will consider the fact that an experienced trial judge observed the witnesses and their manner of testifying and accepted one version of the facts rather than the other. * * * See Clough v. Clough, 132 Neb. 748, 273 N. W. 31; Sutherland v. Sutherland, 132 Neb. 558, 272 N. W. 549; Hild v. Hild, 135 Neb. 896, 284 N. W. 730." Sell v. Sell, 148 Neb. 859, 29 N. W. 2d 877. See, also, Southern Surety Co. v. Parmely, 121 Neb. 146, 236 N. W. 178.

An examination of all of the evidence fails to prove that a trust of any kind arose when the defendant purchased this 80 acres in 1906.

We find that the decree of the trial court is supported by the evidence and the law, and the same is hereby affirmed.

AFFIRMED.