DORA GIACOMINI, EXECUTRIX OF THE ESTATE OF GEORGE T. GIACOMINI, DECEASED, ET AL., APPELLANTS, V. CARRIE GIACOMINI ET AL., APPELLEES.

81 N. W. 2d 194

Filed February 22, 1957. No. 34051.

*John P. Dalton* and *M. L. Donovan,* for appellants.

*Thomas P. Leary,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, Dora Giacomini, as executrix of the estate of George T. Giacomini, deceased, and individually as his widow and sole devisee in his will, brought this action against defendant, Carrie Giacomini, sister of George T. Giacomini; deceased, seeking a decree finding and adjudging that a resulting trust existed against described real estate known as the Lee Building in Omaha and against defendant as title holder thereof to the extent of an undivided one-half interest in favor of plaintiff and the George T. Giacomini estate. Plaintiff prayed for a decree quieting title thereto in her, together with an accounting of rental income from the premises, and equitable relief. The George H. Lee Company, Inc., was made a party defendant because it was a tenant in the premises. By order of court it has been paying its monthly rentals therefor to the clerk of the district court since November 1, 1954. Such defendant, hereinafter designated as Lee Company, is not otherwise interested or in-

volved in this litigation. The parties otherwise directly interested or involved will be designated as plaintiff and defendant, or by their first names. George T. Giacomini, deceased, will be designated as George, and his father, George Giacomini, will be designated as George, Sr.

Plaintiff's alleged right of recovery was substantially as follows: That for more than 20 years prior to the death of George's mother, Mary, on September 17, 1931, she and her daughters, Marie and Carrie, were each the record title holders of an undivided one-third interest in the Lee Building. However, plaintiff alleged that when Mary executed her last will on February 8, 1926, devising to Marie and Carrie each an undivided one-half interest to her undivided one-third interest in the Lee Building, it was orally understood and agreed that if George survived Mary he was to receive equal portions of Mary's estate with Marie and Carrie, which would have given George an undivided one-ninth interest in the Lee Building, and Marie and Carrie each an undivided four-ninths interest therein, although upon Mary's death record title thereto was to vest in Marie and Carrie. It was alleged that upon Mary's death and under the terms of her will duly probated record title to the Lee Building vested in Marie and Carrie until Marie's death July 17, 1947, but that theretofore from September 17, 1931, George had been in open, continuous, adverse possession of his alleged one-ninth interest in such premises until his death October 9, 1954. Also, it was alleged that on July 5, 1932, when Marie executed her last will devising an undivided one-half interest in the Lee Building and her estate to Carrie, it was orally understood and agreed that if George survived Marie he was to receive equal portions of her estate with Carrie, including an undivided one-half interest in the Lee Building, although the record title to such premises was to vest in Carrie. It was alleged that from and after Marie's death and the probate of her will, Carrie and George adopted and carried out a described plan for equalizing a division of

Marie's estate in accord with the aforesaid agreement, and that from July 17, 1947, George was in open, continuous, and adverse possession of his undivided one-half interest in the premises until his death. However, it was alleged that from and after George's death Carrie had attempted to repudiate and disclaim the trust relationship theretofore participated in by her.

Defendant Carrie answered, denying generally and specifically denying that she, Mary, Marie, or any of them ever held the Lee Building under any oral agreement or otherwise as trustee for George or that there was any consideration whatever for any such an alleged agreement. Defendant alleged substantially that she, Mary, and Marie purchased the Lee Building from the Lee Company on January 2, 1912, received a warranty deed thereto, and paid the entire consideration therefor; that Mary's undivided one-third interest therein was devised to Marie and Carrie equally by Mary's last will duly probated, which gave George a legacy of $1,000, made him a conditional residuary legatee and devisee of her entire estate, and nominated George and Marie as executors; and that Marie's will, duly probated, which made George a conditional residuary legatee and devisee of her entire estate and nominated George and Carrie as executors, devised Marie's undivided one-half interest in the Lee Building to Carrie.

Defendant alleged that George was proponent of both such wills; that he served respectively as executor in both estates wherein he listed the Lee Building as exclusively a part of the assets of both estates and took possession thereof as executor; that he filed petitions for final decrees in both estates and participated in so transferring and delivering the Lee Building first to Marie and Carrie and then to Carrie, in conformity with the wills; that in Mary's estate he was paid the bequest of $1,000 and signed a complete release of all claims against the estate; that he never filed any claim in either estate asserting that he had any interest in the

Lee Building; and by reason of said acts and conduct both George and plaintiff were barred and estopped in this collateral action from making any claim to the premises. Defendant alleged that she and her predecessors in interest, as owners, and her tenant the Lee Company, as lessee, had been in possession of the Lee Building ever since January 2, 1912, and denied that George ever had any possession thereof adversely or otherwise, but had always been simply the paid agent of Mary, Marie, and Carrie, or the survivor of them, and entrusted as such to manage the property and negotiate leases therefor; and that he always represented himself in writing and otherwise to be such agent, which barred him and his representative from making any claim to the subject matter of such agency. Defendant alleged that plaintiff's claimed cause of action was barred completely by the statute of frauds, the statute of wills, the statute of limitations, and the laches of plaintiff and George; that defendant and her immediate grantors always had an unbroken chain of title to, ownership, and possession of the Lee Building by themselves under the warranty deed from the Lee Company for more than 23 years; and that plaintiff should be put upon strict proof of every material allegation of her petition by clear, unequivocal, and convincing evidence, as required by law. Defendant prayed for dismissal of plaintiff's petition. Plaintiff's reply was a general denial.

After a trial upon the merits, whereat voluminous evidence was adduced, the trial court rendered a decree which found and adjudged the issues generally in favor of defendant Carrie and against plaintiff, primarily upon the ground that plaintiff had failed to prove by clear, satisfactory, and convincing evidence as required by law that either a resulting or constructive trust should be impressed in favor of plaintiff and George's estate upon the "West two-thirds (W 2/3) of Lot Three (3), Block One Hundred Fifty-one (151), Original City of

Omaha, * * * otherwise known as the George H. Lee Building at 1115 Harney Street, Omaha, Nebraska." It also found that under the evidence, even had any legal or equitable interest been established by plaintiff, the failure of George to bring an action to establish the same during his lifetime, and the laches of George and plaintiff, were sufficient to preclude equity from granting the relief sought. It further found that defendant Carrie had not by any plea of laches, estoppel, or waiver, relieved plaintiff from the legal burden of establishing her claim by a preponderance of evidence clear, satisfactory, and convincing in character. It ordered the rental income theretofore paid by Lee Company to the clerk of the district court to be paid forthwith to Carrie or her attorney. Thereafter plaintiff's motion for new trial was overruled and she appealed, assigning in effect that the findings and judgment of the trial court were not sustained by the evidence but were contrary thereto and contrary to law. We conclude that the assignments should not be sustained.

At the outset plaintiff assigned and argued that defendant, having pleaded laches, estoppel, and waiver, had admitted the facts alleged in plaintiff's petition. The contention has no merit under the pleas presented in this case. In such respect, plaintiff relied upon Anderson v. Anderson, 155 Neb. 1, 50 N. W. 2d 224, wherein we held: "Facts alleged in a petition to which the defendant in his answer pleads a waiver, an estoppel, or a matter to avoid, will be treated as admitted, though the answer also contains his general denial." Such holding was simply a general rule applicable and controlling the particular situation presented in that case, which is entirely distinguishable from that presented in the case at bar. Here we have no technical plea of waiver as such, so only the questions of laches and estoppel in pais are presented.

The general rule is that: "More than one defense may be interposed to the same cause of action, provided

they are not inconsistent with each other; they are not inconsistent unless the proof of one necessarily disproves the other." Colbert v. Miller, 149 Neb. 749, 32 N. W. 2d 500.

In Blodgett v. McMurtry, 39 Neb. 210, 57 N. W. 985, which presented comparable issues with regard to estoppel, this court held: "A plea of estoppel may be joined with a general denial when the averments by way of estoppel are not inconsistent with such denial." In the opinion it is said: "We have been unable to find any case holding that a plea of estoppel in pais cannot be joined with one amounting to a traverse, where the two are not in their natures inconsistent. Here they are not inconsistent."

In Webber v. Ingersoll, 74 Neb. 393, 104 N. W. 600, this court held: "An answer setting up the statute of limitations is not a technical plea of confession and avoidance; whether an answer of a supposed estoppel is so or not depends upon the nature of the matter alleged in the plea." Plaintiff cites no authority for her contention that a plea of laches constitutes a plea of confession and avoidance. In such respect, under the pleadings at bar, it appears to be generally analogous to a plea of the statute of limitations. Baxter v. National Mtg. Loan Co., 128 Neb. 537, 259 N. W. 630, cited with approval in Watson Bros. Transp. Co. v. Red Ball Transf. Co., 159 Neb. 448, 67 N. W. 2d 475.

With regard to a plea of the statute of limitations, the opinion in Webber v. Ingersoll, *supra,* said: "In effect, if not in form, the plea is that the plaintiff ought not to have or maintain his suit, because the facts out of which a cause therefor is alleged to have accrued are not averred to have taken place or did not in fact occur, if at all, within the period of limitation before the action begun. This plea is quite consistent with the contention that they did not take place at all, and the two issues may be, and usually are, tried as one. If the plaintiff fails to prove the existence of the requisite

facts, he, of course, fails to recover; but if he proves them, and it appears that their occurrence was too remote in time, he also fails." With regard to a plea of estoppel, that opinion said: "As to estoppels, there are several varieties of them. An estoppel, for instance, may consist of a waiver by which the plaintiff has foregone or abandoned a previously subsisting and valid cause of action; and a plea of such an estoppel of necessity confesses the existence of the facts, the effect of which, it is alleged, was afterwards waived. But there are other estoppels which arise out of the very transaction and circumstances upon which the plaintiff relies as affording him a ground of recovery, and a plea of such an estoppel, so far from confessing and seeking to avoid, amounts to a practical denial of the plaintiff's cause of action. And there is still another kind, in which it is averred that the conduct of the plaintiff since the alleged accrual of his supposed cause of action has been such as to lead the defendant to believe that it did not exist or would not be asserted, and that the latter has conducted his affairs accordingly, and that therefore whether the plaintiff has a good cause of action arising out of the facts alleged by him or whether he has not is immaterial, because he ought not in good conscience to be permitted to assert it. * * * In this last case, if the matter alleged in estoppel is sustained by sufficient proof, there is no occasion to inquire whether the averments of the plaintiff are true or false, but if the defendant fails in his proof, the plaintiff must still establish the truth of his averments, unless it is admitted otherwise by the plea of estoppel." The first kind of estoppel aforesaid appeared in Anderson v. Anderson, *supra*. The last two kinds appear in the case at bar, and the statements with regard thereto are applicable and controlling here.

On appeal to this court, actions in equity such as that at bar are triable de novo under the rule promulgated in

Wiskocil v. Kliment, 155 Neb. 103, 50 N. W. 2d 786, and other authorities too numerous to cite.

In Restatement, Trusts, ch. 12, p. 1249, it is said: "A resulting trust arises where a transfer of property is made under circumstances which raise an inference that a person making a transfer or causing a transfer to be made did not intend the transferee to have the beneficial interest in the property transferred. A constructive trust is imposed not because of the intention of the parties but because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property. A constructive trust, unlike an express trust or resulting trust, is remedial in character."

It is now well established as a general rule that the burden of proof is upon one seeking to establish and enforce either a resulting or constructive trust to prove the same by a preponderance of evidence which is clear, satisfactory, and convincing in character. Holbein v. Holbein, 149 Neb. 281, 30 N. W. 2d 899; Peterson v. Massey, 155 Neb. 829, 53 N. W. 2d 912.

In 23 C. J., Executors and Administrators, § 372, p. 1158, citing Veeder v. McKinley-Lanning Loan & Trust Co., 61 Neb. 892, 86 N. W. 982, and other authorities, we find the general rule that: "If an executor or administrator receives property in his representative capacity, he is estopped afterwards to deny that it is property of the estate." In the cited opinion we said: "It must be borne in mind that the administrator acted with full knowledge of all the facts regarding his alleged equitable title. He deliberately chose the course of conduct adopted and followed, and now to permit him, or those claiming under him, to deny the title of the estate and claim through another source, is to invite and sanction a course of wrongdoing contrary to law and good morals. * * * The administrator must be held to be estopped by his own acts from now setting up a claim to the property in his own right."

In 33 C. J. S., Executors and Administrators, § 128, p. 1084, citing authorities, it is said: "A personal representative who takes possession of property in his fiduciary capacity is generally estopped to deny the title of his decedent or to set up an adverse title to the injury of those beneficially interested in the estate." Also, in Annotation, 146 A. L. R. 1182, citing Overlander v. Ware, 102 Neb. 216, 166 N. W. 611, and other authorities, it is said: "Estoppel to assert against a decedent's estate a claim antedating the decedent's death has been held to arise from statements or conduct on the part of the claimant inconsistent with such assertion."

In Overlander v. Ware, *supra,* this court said: "If Clark had believed, when Kelly died, that under the contract he was the owner of all the property, it is natural to suppose that he would have at once made claim to it upon the ground, as he was in duty and law bound to do if such was his claim. Instead, he makes application that letters of administration be granted, and permits the estate to be administered before asserting his rights. * * * The attitude of Clark in participating in the administration proceedings and in permitting final decree therein, without asserting his rights to any part of the estate except the 80 acres, estops him from asserting ownership of the entire estate. As to that portion of the estate, it amounts to an election on his part to take as heir and not as owner."

The foregoing rules and statements are applicable and controlling here, and in the light thereof, we have examined the record, which, summarized, fairly discloses the following: George, Sr., died intestate on June 25, 1900. He left a large estate consisting of personal property and various parcels of real estate in Omaha, including the west half of Lot 3 and all of Lot 4 in Block 41; Lot 6 in Block 89; and Lot 8 in Block 104, which he had owned for many years. His heirs at law were Mary, his widow, who never remarried; Anna, a married daughter sometimes designated as Mrs. E. E. Huntley;

Marie and Carrie, daughters who never married; and George, a married son. In that connection, George's first wife divorced him on January 2, 1903, for nonsupport, and he subsequently married Dora, the plaintiff, on September 1, 1936. Mary was administratrix of the estate of George, Sr. Under the statute of descent and distribution then in force, the property owned by him at the time of his death descended in equal shares to his four children, subject only to a life estate in a one-third interest by Mary, his widow. Subsequently it will be observed that George, Marie, and Carrie each acquired an undivided one-third interest in the real estate heretofore described, which was a part of their father's estate. It should also be noted here that the Lee Building; Lot 14, Block 1, Field Crest Addition to Omaha, the home of Mary, Marie, and Carrie on Walnut Street; Lot 5, Block 89; Lot 1, Block 57; Lot 4, Block 174, in Omaha; and other property unimportant here, were never owned by and never were any part of the estate of George, Sr.

In that connection, the record conclusively shows that on January 2, 1912, some 12 years after the death of George, Sr., the Lee Building was purchased from the Lee Company by Mary, Marie, and Carrie for $32,000, subject to a mortgage for $15,000, and as named grantees they then received a warranty deed thereto. They paid the entire consideration therefor, including the mortgage. George never paid any part thereof and was not a party thereto except that a final statement in purchase thereof designated him as rental agent. The Lee Company has been in possession of such premises as lessee ever since January 2, 1912, under numerous leases executed by it as lessee, and by Mary, Marie, and Carrie during Mary's lifetime, or by Marie and Carrie during Marie's lifetime, or by Carrie after Marie's death, as lessors. George generally negotiated such leases as the paid agent respectively for his mother and sisters, and his name appeared thereon as "George T. Giacomini, Agent,"

as it did in his bank account from 1924 to 1949, when it was closed after all property originally a part of his father's estate had been sold and George's salary as managing agent thereof had ceased. One such lease with Lee Company executed in 1951 designated Carrie and George "parties of the first part" as lessors, but upon discovery thereof by Carrie and notice to George, who made no known objection thereto, an extension thereof was duly executed by Carrie only upon condition that it should be understood that "parties of the first part" appearing in such lease referred only to Carrie as sole owner and lessor, with insurance payable to her only in case of loss. George was never in possession or had any right to possession of the Lee Building as lessor or owner. It was always understood that George, in dealing with the Lee Company, was only managing agent for his mother and sisters, to whom the rentals therefor were always paid. George never collected the Lee Building rentals. As a matter of fact, there is no evidence that George during his lifetime ever claimed to anyone, even his wife, the plaintiff here, that he owned any interest in the Lee Building. Plaintiff so admitted in her own testimony when she said: "And George never talked business to any living sole (sic) only his sister. He didn't tell anybody he owned the Lee Building or he didn't." Also, sometime after 1950, plaintiff told Carrie's niece, Mabel, that although George had never told her so, she thought that George owned part of the Lee Building. However, when Mabel called Carrie's attention to that conversation, she replied: "Marie and I owned it, and now I own it since Marie died."

Theretofore, Mary had purchased the residence property on Walnut Street in Omaha, where after 1918 Mary, Marie, and Carrie made their home during Mary and Marie's lifetimes, and where Carrie, 86 years old at the time of trial, still lived. Plaintiff makes no claim to any interest in that property, and George never did. In 1907

Marie and Carrie purchased Lot 1, Block 57, in Omaha, and sold it in 1944, yet plaintiff makes no claim that George ever had any interest in that property, and George never did. Concededly, he did not receive and was not entitled to receive any part of the proceeds of that sale. In 1935 Marie and Carrie purchased Lot 5, Block 89, in Omaha. In 1945 both such lot and adjacent Lot 6, Block 89, were sold for $35,000. Concededly at that time George had no interest in Lot 5, but he did then own an undivided one-third interest in Lot 6, which was originally a part of his father's estate. After appraisal of Lot 6 for $15,000, George was concededly allowed and paid $5,000 by Marie and Carrie for his one-third interest in Lot 6, but George, without any complaint, was allowed nothing for any interest in Lot 5, which belonged to Marie and Carrie.

On January 13, 1949, Carrie executed a will, subsequently revoked, which among other things gave George all of her real estate, including . the Lee Building, if he survived her, together with all income from her bonds, stocks, and securities, until his death.

Subsequently, on February 23, 1949, after Marie's death, George was very ill, so upon advice of counsel, in order to facilitate administration of his estate, George and plaintiff, as husband and wife, executed a survivorship deed to themselves as joint tenants, thereby conveying an undivided one-third interest in and to the west half of Lot 3 and all of Lot 4, Block 41, and Lot 8, Block 104, in the city of Omaha, which were properties originally a part of the father's estate. However, no claimed interest in the Lee Building was included in that survivorship deed. Subsequently, when the west half of Lot 3 and all of Lot 4 in Block 41 were sold in 1949, after Marie's death, for $8,000, George then concededly owned only an undivided one-third interest therein. However, without any necessity and without any request or demand by George, he received from Carrie $4,000, which was one-half of the proceeds of the sale. The difference

was a gift to him by Carrie. Also, when Lot 8, Block 104, was sold in 1949 for $36,000, George concededly owned only a one-third interest therein. However, without any necessity and without any request or demand by George, he received $18,000 from Carrie, which was one-half of the proceeds of that sale. Again, the difference was a gift to him by Carrie.

When George, Sr., died in 1900, his son George was a druggist. Thereupon George sold out his business and never again had any steady employment outside the family. He supported himself with income from his own properties or interests therein, and by receiving a salary until 1949 for the management of the property and interests then belonging to his mother and sisters, for whom George acted as agent. The amount of his compensation as such agent depended upon the amount of rents collected, and such salary was either deducted by him from rents collected by him or otherwise paid directly to him.

After his divorce George sought the intimate society of women. At least one of them threatened him with lawsuits. In that connection, plaintiff offered in evidence several conveyances of George's interests in described properties which he owned or had received from his father's estate. Such conveyances, beginning in 1910 and ending August 3, 1935, were either from George to Marie and Carrie, or from Marie and Carrie back to him for only nominal considerations. Plaintiff claimed that they were attempts by George to protect himself against liability to that woman by making himself judgment proof. Be that as it may, on February 15, 1933, Carrie, with aid of George's counsel, obtained a written release from any liability by George to that named woman who had threatened to sue him for breach of promise, claiming "that an intimate relationship has existed between her and George T. Giacomini, of Omaha, Nebraska, for many years past." The consideration for such release was a cash payment of $1,740, and a prom-

issory note given for a like amount, due in one year and signed by George, Marie, and Carrie. In that connection, thereafter on August 3, 1935, more than a year before plaintiff Dora married George, all of his claimed interest in all of his property theretofore conveyed to Marie and Carrie had been conveyed back to George by them and there were no further title transactions between George and his sisters. It is interesting to note that although plaintiff claims that George had an interest in the Lee Building during that period of time, no mention was ever made of it in any of such conveyances aforesaid. Also, there is no clear, satisfactory, and convincing evidence of any agreement between George and Mary, Marie, and Carrie or any of them that George was to ever have or own any interest in the Lee Building or even that he had ever claimed to them or any other person that he owned any interest therein.

Mary, the mother, died testate on September 17, 1931. George, Marie, Carrie, Anna, and Anna's daughter Mabel, survived her. Insofar as important here, Mary's last will gave her daughter Anna $2,500, and her granddaughter Mabel $1,000. It devised her undivided one-third interest in the Lee Building to Marie and Carrie equally, or to the survivor of them, but George was to receive Mary's one-third interest if neither Marie nor Carrie survived testatrix. Mary's will devised to Marie and Carrie each an undivided one-half interest in Lot 14, Block 1, Field Crest Addition to Omaha, the home on Walnut Street, upon like survivorship terms and conditions. It devised all of her other separate property as follows: An undivided one-fourth interest to Anna and an undivided three-fourths equally to Marie and Carrie upon like survivorship terms and conditions. It gave George a legacy of $1,000, and appointed George and Marie as executors. George himself prepared and filed the petition for probate of her will. Thereafter it was admitted to probate and such executors were appointed. Their inventory of Mary's estate, duly prepared, signed,

acknowledged, and filed by them, listed, among other things, "An undivided one-third (⅓) interest in and to the West Two-Thirds (⅔) of Lot Three (3), in Block One Hundred and Fifty-one (151), Original City of Omaha, Douglas County, Nebraska," (the Lee Building) as belonging to Mary at the time of her death.

Anna was not satisfied with the provisions of Mary's will, so by way of compromise and settlement on June 23, 1932, she received the $2,500 legacy and a special warranty deed from Marie and Carrie to the south half of Lot 4, Block 174, original city of Omaha, in full and complete satisfaction of any and all claims which she then or thereafter had against Mary's estate. Also, on April 28, 1932, Anna, her husband, and George, conveyed to Marie and Carrie their undivided one-half interest in Lot 6, Block 89, and the west one-half of Lot 3, and all of Lot 4, in Block 41, original city of Omaha, which was property originally in their father's estate.

However, thereafter on August 3, 1935, Carrie and Marie deeded back to George a one-third interest in such described property. In that connection, the Lee Building was not in any manner involved in such transactions, and no claim for any interest therein was ever filed by George in Mary's estate. Rather, the final decree rendered therein assigned to Marie and Carrie each an undivided one-half interest in and to Mary's undivided one-third interest in the Lee Building, which resulted in Marie and Carrie each owning an undivided one-half interest therein. Such decree also approved the bequest of $1,000 to George who, on June 21, 1932, prepared, signed, and filed a receipt for payment thereof to him, which stated, "the same being payment in full of any and all sums due him under the will of Mary Giacomini, deceased, and in full payment of any and all claims of the undersigned against said estate." The executors were finally discharged on September 7, 1932. In that connection, defendant testified that George subsequently received his share and more of that portion of all

properties which were originally a part of his father's estate, because it belonged to him. However, the evidence clearly establishes that such division did not include but specifically excluded any interest in the Lee Building, the home on Walnut Street, and all other property which was subsequently purchased by and belonged to Mary, Marie, and Carrie, or the survivor of them.

Marie died testate July 17, 1947. Her will, executed July 5, 1932, gave $1,000 to Mabel, her niece, and $500 to her sister Anna if she survived testatrix, otherwise it became a part of Marie's estate. The residuary clause gave all of Marie's property to Carrie if she survived testatrix, otherwise to George. The petition for probate was filed by George and Carrie, who were nominated as executors. Marie's will was admitted to probate and such executors were appointed. Thereafter, George and Carrie duly prepared, signed, acknowledged, and filed a typewritten inventory of Marie's estate, listing therein among other things: "An undivided one-half interest in West Two-Thirds of Lot 3, Block 151, City of Omaha, being 1115 Harney Street, Omaha," (the Lee Building) as belonging to Marie at the time of her death. Previously, at the request of and for the benefit of counsel for the estate, a list of property belonging to Marie at the time of her death was made out by George in his own handwriting. It recited, among other things: "Invoice of the Estate of Marie Giacomini Deceased. Real Estate * * * W⅔ Lot 3 - Block 151 - 1115 Harney St - ½ Int." Also, with regard to its preparation, counsel for Marie's estate testified that in talking with George: "I asked him on the Lee Building at 1115 Harney, who owned it, and he said Marie owned a half of it and Carrie owned a half of it." Further, no claim for any interest in the Lee Building was ever filed by George in Marie's estate, and the final decree therein gave the residue of Marie's property, including Marie's undivided one-half interest in the Lee Building, to Carrie, whose title thereto

was then complete. The executors were discharged on April 19, 1948.

George died testate on October 9, 1954, when he was 81 years old. His will, executed September 4, 1947, gave his sister Anna $100 if she survived him, otherwise it was given to her daughter Mabel. It gave $100 to Carrie if she survived him, otherwise it was given to her niece Mabel. The residue of his estate, without description thereof, was given to plaintiff, his wife, who was named executrix. His will was duly probated and plaintiff was so appointed on December 15, 1954, after which plaintiff's second amended petition was filed herein.

At the time of trial Carrie was the only one of the immediate family surviving. The family was renowned for longevity. The mother, Marie, Carrie, and George were always affectionately, unselfishly, and loyally devoted to each other, with never a difference or controversy. Every day of his life that he was able to do so, George went to see his mother and sisters, or telephoned to them while they lived. He continued to do so with Marie and Carrie after his mother's death, and with Carrie after Marie's death. He acted as their agent in the management of their properties, and was paid a salary by them for doing so, until the properties originally belonging to their father's estate were finally sold in 1949. Years before that Carrie gave George a car. Over the years he needed more money than they were paying him, and when he asked for it, they gave it to him. He became ill about 6 years before his death and gradually got weaker and weaker until his death on October 9, 1954. Nevertheless, he was able on Friday and Sunday before his death to drive his car over to see Carrie, and he did so. Carrie paid all of his hospital bills over a period of 3 months in 1949. For many years Carrie and Marie had each given him $25 for Christmas, and after Marie's death in 1947, Carrie continued to give him $50 each Christmas until his

death. Shortly before his death, Carrie gave him $250 to have his car repaired.

During her lifetime, Marie generally handled all financial transactions for herself, Mary, and Carrie. In that connection, monthly rentals for the Lee Building were always paid to Mary, Marie, and Carrie, or the survivor of them. There is evidence that after 1942 when they were so paid, Marie would make a remittance to George of as much as one-ninth thereof. The last five of such monthly payments were consolidated as one and paid by Carrie on December 14, 1947. Plaintiff argued that payment of such portions of the Lee rentals, together with other related facts and circumstances, established that George respectively owned first an undivided one-ninth interest, then an undivided one-half interest in the Lee Building itself, as claimed by plaintiff. We do not agree. As we view it, such contention was not established by a preponderance of clear, satisfactory, and convincing evidence. In that connection, it will be noted that the amount of George's compensation as managing agent depended upon the amount of rentals collected, which he either deducted from the rents collected by him, or he was paid by Marie if Marie and Carrie collected it. Under the circumstances presented in this case, it is only logical to conclude that such payments made by Marie were compensation to George for his services as managing agent of the Lee Building. In other words, he had a compensatory interest in the Lee Building rentals but none in the building itself. To hold otherwise would be purely speculative and conjectural.

It was admitted by Carrie that beginning on March 8, 1948, after George's income had been reduced and plaintiff and George needed money, Carrie began giving George one-half of the monthly Lee rentals as a gift, and after George's income as agent had terminated in 1949, when the last properties belonging to his father's estate had been sold, George was ill and needed money,

so Carrie continued until the time of his death to give him one-half of the monthly Lee rentals as a gift. Carrie's unswerving devotion to and her prior charitable treatment of George, her only brother, together with other related evidence, gives such testimony credibility. True, it appears that in 1949, 1950, and 1951 George paid part of the taxes upon and some expenses for maintenance of the Lee Building, in order to help Carrie and get credit therefor in his income tax returns. However, it is established by a preponderance of the evidence that all such payments made by Carrie to George were gifts because he needed money; that he never in his lifetime had any agreement with or made any claim to Marie or Carrie or anyone else that he owned any interest in the Lee Building itself; and that he never had any such interest.

For reasons heretofore stated, we conclude that the judgment of the trial court should be and hereby is affirmed. All costs are taxed to plaintiffs.

AFFIRMED.