PROVOSTY, J.
This suit is brought on a policy of insurance issued by the defendant company on plaintiff’s dwelling and its appurtenances, which were destroyed by fire. Two creditors of plaintiff have intervened, claiming nearly the entire amount of the insurance, by virtue of mortgages they held on the property. That the debts are due, and were secured by mortgage on the property insured, is not contested.
*1022 The defenses are, first, that nothing is due, •because at the time of the fire the policy had become void as the result of the accomplishment of certain conditions expressed in it; and, second, that at any rate the amount claimed is excessive, because the value of the property insured, which is all that plaintiff can be entitled to, was less than the amount demanded.
The conditions thus relied upon as having nullified the policy by their accomplishment are expressed in the policy as follows:
“This entire policy shall be void * * * if, with the knowledge of the insured, foreclosure proceedings be commenced or notice given of sale of any property covered by this policy by virtue of any mortgage or trust deed; or if any change, other than by the death of the insured, takes place in the interest, title or possession of the subject of insurance, whether by legal process or judgment, or by voluntary act of the insured, or otherwise.”
Defendant contends that all of these conditions were accomplished at the time of the fire, namely, that foreclosure proceedings had been commenced, that notice of sale of the property by virtue of a mortgage had been given, and that a change had taken place in the interest, title, or possession of the plaintiff.
The facts on which these contentions are based are the following: From the middle of April before the fire, which took place on the 27th of June, plaintiff had concluded he would have to sell the property to pay the mortgage debts upon it, the same debts now being demanded by the interveners; and accordingly he had employed a real estate broker to find a purchaser. The larger of the two debts, the one which plaintiff was unable to pay, and which was first in rank on the property, was to fall due on the 9th of May. When that date arrived, Mr. Tobin, agent for Mrs. Tobin, the creditor, insisted upon payment of at least the interest, threatening judicial enforcement of the mortgage in default of immediate payment. Even that much, plaintiff was unable to pay, not even by the sale of some of his furniture. Plaintiff begged for time, and finally, on the 28th of May, no purchaser having yet presented, he placed the property in the hands of an auctioneer. He fixed the upset price at $10,-000. On the next day, the 29th of May, he received from Mr. Tobin a peremptory notice that, unless the Tobin debt was paid by the 31st of May (that is, within three days), foreclosure proceedings would be instituted at once. This led to an agreement by which plaintiff reduced the upset price from $10,000 to $7,000, and Tobin consented to withhold proceedings until the day of the auction, the 13th of June. On the 31st of May plaintiff obtained from the insurance company a permit to leave the property vacant for 30 days. Whether before or after obtaining this permit, does not appear, but about this time he changed his residence from New Orleans to Covington, and moved out of the house and left it vacant. I-lis going to Covington was in search of health, he being a very sick man — dying, in fact, shortly after the institution of this suit.
The auction proved a disappointment. No sale was made. The parties had found that, to cover the debts and expenses, the upset price would have to be raised to $7,700, and they had accordingly raised it; and this higher price was not bid. Plaintiff, who had come to the city for the auction, returned to Covington, still begging for time, and hoping that matters might be so arranged as at any rate to let the debts be satisfied by the property. His plan now was that one of the creditors should take the property and pay the other creditor. Still in hope of carrying out this plan, and in order to gain more time, he, in last resort, on the 25th of June, at Covington, signed the following' document:
“Office of Civil Sheriff, Parish of Orleans. In re Mrs. Mary F. Tobin vs. Herman Stenzel. No. -. New Orleans, —, 1903. In above case I accept service of demand of payment and waiving legal delays, consent that the writ of seizure and sale issue at once — and under the writ I waive service of notice of seizure and further waiving all legal delays, consent that the property be advertised for sale at once, also waive appraisement of the property to be sold. [Signed] Herman Stenzel. Witnesses: [Signed] W. S. Palfrey. [Signed] John F. Tobin.”
The fire occurred on the 27th of June, two days after the signing of this document, and four days before the expiration of the vacancy permit. The conjunction of these *1024 dates, taken in connection with the other circumstances of the case, gives rise to a suspicion of incendiarism; but nothing of that kind is charged, and doubtless the charge, if made, could have been effectually refuted.
Under these facts, we are of opinion that there did not take place “any change in the interest, title or possession of the subject of insurance.” The “interest” here meant is a legal interest; that is to say, the word “interest,” as here used, has the same meaning as in the stereotyped phrase “right, title and interest.” It means proprietary or insurable interest. For the history of this clause as found in standard policies, and its scope and meaning, see 13 Am. & Eng. Ency. pp. 241, 252. Giving to the word “interest” this meaning, there had been no “change in the interest, title or possession of the subject of insurance.” Plaintiff had continued to be sole and exclusive owner and possessor, of the property insured, as fully and completely as theretofore. Perhaps that, with the realization of his having to let the property go for the debts, his interest in it, in the sense of his attachment to it, or of his solicitude or concern about it, underwent a change; but this would bo a change in his sentimental interest, and the stipulation has no reference to such. If it had, the validity of standard policies- would depend not upon the permanency of the legal relations of the assured to the property, but upon the constancy of his love and affection for it. Learned counsel would not and do not contend that such a vagué and unbusinesslike meaning could be attributed to the word “interest” as used in this clause.
We are further of opinion that there was not given to plaintiff a notice of sale by virtue of a mortgage, within the meaning of the clause that the policy should be void “if notice be given of sale of any property covered by this policy by virtue of any mortgage or trust deed.” This clause must be read in the light of the fact that in some states, and notably in Pennsylvania, the home of the defendant company, there is such a thing as enforcing a mortgage extrajudicially, by simply giving notice of sale, and that the policy in which this clause is found is what is known as a “Standard Policy”; that is to say, not a document drawn up specially to evidence this particular contract of insurance, but a printed form used for all the insurance written by the defendant — in fact, imposed upon the defendant by a statute of the state of its domicile. As to standard policies, see 9 Am. & Eng. Ency. p. 222. As to enforcing mortgages by mere notice of sale, see 9 Ency. Plead. & Prac. pp. 111, 114, 165, 166, 783. Bearing, then, in mind that in a number of states, and notably in the home state of defendant, mortgages may be enforced in two ways — by foreclosure proceedings, and by an extrajudicial giving of notice of sale — we readily see what is meant by the stipulation, “if foreclosure proceedings be commenced or notice given of the sale of any property covered by this policy by virtue of any mortgage or trust deed.” The scope and meaning of the stipulation is then, in reality, this: That the policy shall be void if the insured confers upon the mortgagee the right to enforce the mortgage extrajudicially, by merely giving notice of sale, and such mortgagee proceeds to enforce the mortgage in that manner. Evidently the condition is one which can, in the nature of things, have no operation in this state, where such a mode of enforcing mortgages is unknown; and, as a consequence, in this state the clause stands in the policy as mere harmless surplusage.
The remaining question, in connection with this first defense, is whether at the time of the fire foreclosure proceedings had been commenced, within the meaning of the clause, “the policy shall be void if foreclosure proceedings are commenced.” Strictly speaking, there is in this state no such thing as a foreclosure proceeding. Here, however, as elsewhere, mortgages have to be enforced, and this clause evidently has application to whatever proceedings may be appropriate for the enforcement of mortgages.
But this in Louisiana means judicial proceedings, since here mortgages are not enforced extrajudicially. Waivers of delays and of legal formalities may have the effect of facilitating and expediting very much the enforcement of the mortgage or the foreclosure proceedings, but they do not of themselves constitute such enforcement or foreclosure proceedings. They are matters of consent; perhaps of reluctant consent, still of consent. They may be made, as happened in the present case, fop the very purpose of staving off foreclosure proceedings. *1026 The delay obtained in consideration of their being made might be of a whole year, or they might be made when the mortgage debt had yet a 12 months to run, until the lapse of which, enforcement or foreclosure proceedings would be a legal impossibility. They, or most of them, are not infrequently met with in the very act itself in which the mortgage is given. If they constitute a commencement of foreclosure proceedings, then of all such mortgages it may be said that their death knell began to be sounded simultaneously with their birth; in other words, that they were born dead. We think that in Louisiana “commencement of foreclosure proceedings” must be held to be synonymous with “filing of suit.”
It is strenuously, but rather vaguely, argued that these stipulations against foreclosure and change of interest and notice of sale were inserted as a protection against the greater moral risk which a diminution of motive on the part of the insured to preserve the property, consequent upon a diminution of his interest therein, would bring about, and that under the facts of the case there was such a diminution of interest and of motive, and such increment of risk, the insured having fully realized that the property was lost to him — having, in fact, as it were, abandoned it to his creditors — and that consequently the contingency sought to be guarded against by the stipulations had come about, and the policy become void, at the date of the fire. The argument is only specious. The answer is that, taking the word “interest” in the sense of proprietary or insurable interest, the insured had as plenary interest in the property at the time of the fire as he had had theretofore, and that, so far as diminution of motive in preserving the property is concerned, the policy does not undertake to stipulate sweepingly against any and all diminution of motive, from whatever cause, but only against such as might result from the occurrence of certain specified contingencies, namely, those of foreclosure and change of interest and notice of sale, and that these contingencies thus specifically .stipulated against have not happened, or, at any rate, are held in this opinion not to have happened.
Concluding, then, that the first defense is not good, and that the policy was in full force when the fire occurred, we' have to consider the second defense — that the amount claimed is excessive.
The insurance was $8,000, and the entire amount, less $30, theretofore paid for a partial loss, is demanded. It has been seen that the property as a whole — that is to say, the buildings, together with the lot they stood on — could not be sold at auction for $7,700. If from the $7,700 is deducted the value of the naked lot, estimated as high as $3,500, there is left an amount very much below that claimed by plaintiff, and defendant insists upon that mode of arriving at the value of the property. But it is a very common thing for property not to bring its real value at auction, and in fact for property not even to be salable at its real value; and what the defendant company has bound itself to make good is not the market value of the property, but its “actual cash value.”
How this actual cash value is to be ascertained is stated in 13 Am. & Eng. Ency. of Law, p. 367, as follows:
“Except as otherwise provided by valued policy laws, the measure of the insurer’s liability in case of a destruction of the building is the fair value of the property destroyed, or, as it has been put, the intrinsic value of the building, not the cost of rebuilding, nor the difference in the value of the ground with and without the building. And it is the real value of the building as such, not its relative value to the insured.”
In a note to the above we find the following:
“The insurer cannot complain if he pays no more than the value of the property he has insured, no more than the sum insured upon it, and no more than the interest of the insured at the time of the loss. He thus pays no more than an indemnity under his contract. It is no defense to him that the loss may, by reason of other collateral and independent contracts, give an advantage to the insured. Washington Mills Emery Mfg. Co. v. Weymouth, etc., Mutual Fire Insurance Co., 135 Mass. 503.”
In the instant case the insured property cost originally $8,061, and improvements had been added to it. The cost of rebuilding would have been at least 20 per cent, greater, owing to the rise in the price of material and labor. The deterioration is estimated at 10 *1028 per cent. Plaintiff testified, the insured property was worth $8,500. Under all the circumstances, we think the judge a quo was right in allowing the full amount of the insurance.
Judgment affirmed.