RELIANCE INSURANCE COMPANY,
Appellant,

v.

ORLEANS PARISH SCHOOL BOARD,
Appellee.

ORLEANS PARISH SCHOOL BOARD,
Appellant,

v.

RELIANCE INSURANCE COMPANY,
Appellee.

No. 19580.

United States Court of Appeals
Fifth Circuit.

Sept. 19, 1963.

Rehearing Denied Dec. 12, 1963.

804

Eberhard P. Deutsch, Rene Himel, Jr., Frank J. Peragine, New Orleans, La., Deutsch, Kerrigan & Stiles, New Orleans, La., of counsel, for appellant.

Samuel I. Rosenberg, New Orleans, La., for appellee.

Before TUTTLE, Chief Judge, and WISDOM, and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

In this action for a declaratory judgment the Court is asked to construe a fire insurance policy covering the public school properties in Orleans Parish, Louisiana. The principal question for decision is whether the policy is a scheduled policy, as the insurance company contends, or a blanket policy as the district court held. We agree with the district court on this major point.

In March 1954 the Orleans Parish School Board issued invitations for bids on fire and explosion insurance on its schools and their contents. The bid specifications included a form described in its heading as, "Location of Schools and Statement of Values". Reliance consistently refers to this form in its briefs as the "Schedule of Values" or the "Schedule". The bid specifications also included a form identified in its heading as, "School Form-Blanket". This form relates to coverage and other conditions. The aggregate face of the policies, when issued was $49,883,196.57, representing 90% of the aggregate valuation (then $55,425,773.96) of the insured properties according to the values listed in the "Statement of Values". The insurance was placed with the Reliance Insurance Company and three other companies. Reliance carried fifty per cent of the total insurance.

March 27, 1958, Landry School in New Orleans was almost totally destroyed by fire. On the date of the fire, the face value of Reliance's policy was $28,880,-209.29. The school and its contents were valued at $337,192 in the statement of values. Reliance deposited $135,193 in the registry of the court, contending that this was the maximum amount it owed under its policy, and sought a judicial declaration that its liability was limited to the value of Landry School as shown in the statement of values. The Board withdrew the deposited sum of $135,193 and filed a counter-claim for $115,052.50 plus penalties, interest, and attorney's fees.

The Board contends that Reliance issued a blanket policy and was therefore liable for the full amount necessary to restore the damaged building to its original condition, together with the actual cash value of the movable (personal) property destroyed. Reliance contends that the only indication the policy may have been intended to be a blanket policy, is the word "Blanket" in the heading, "School Form-Blanket"; that, considering the policy as a whole, the "Schedule of Values" (that is, the statement of values) was incorporated by reference in the endorsements and was treated at all times as part of the policy. The district court held in favor of the School Board and, in a later phase of the litigation, refused to reduce the judgment by allowing for the building's depreciation at the time of the fire. Reliance appeals.

## I.

Both parties agree that this action is governed by Louisiana's Valued Policy Law. Section 695 provides, in relevant part:

"Under any fire insurance policy * * * on any inanimate property, immovable by nature or destination, situated within the state of Louisiana, the insurer shall pay to the insured, in case of partial damage, * * * such amount, not exceeding the amount for which the property is insured, at the time of such partial damage, in the policy of such insurer, as will permit the insured to restore the damaged property to its original condition." LSA–R.S. 22: 695, subd. B.

█ The parties disagree as to whether the court may refer to the "Location of Schools and Statement of Values" in construing the contract. The Board takes the position that it is not part of the policy and is even inadmissible in evidence. Appleman states the general rule:

"The standard form fire policy evidences an intent to put the entire insurance contract into one instrument in the hands of the insured. Statements and agreements, to be effective as part of the policy, must usually be physically endorsed thereon or attached thereto, and while documents unattached to policies may be examined to ascertain the insurer's obligation, they may not control such obligation, or otherwise affect the insured's rights." Appleman, Insurance Law and Practice, § 7527, p. 261 (1962).

Article 1949 of the LSA–Civil Code limits reference to "other contracts or agreements made on the same subject between the same parties". Here, the valuation sheet was annexed to, and made a part of the invitation for bids resulting in a contract between the Board and Hardin and Ferguson, Inc., agents for both the Board and Reliance.

The authorities the Board cite only skirt this case. Here the parties incorporated the valuation sheet by reference in the first endorsement, which was a part of the policy when it was issued. The reference is repeated in almost all of the forty later endorsements.[1] Nothing in the Louisiana Insurance Code or in the Civil Code would prevent reference to the list. See Walker v. Gravier, La.App.1961, 131 So.2d 553; Dalgarn v. New Orleans Land Co., 1927, 162 La. 891, 111 So. 271; Bush Wine and Liquor Co. v. Wolff, 1896, 48 La.Ann. 918, 19 So. 765; Heirs of Delogny v. Mercer, 1891, 43 La.Ann. 205, 8 So. 903; Labiche v. Jahan, 1844, 9 Rob. 30; Suarez v. Duralde, 1830, 1 La. 260. See also 3 Williston on Contracts (rev. ed.), Section 628; Bell v. The Western Marine & Fire Ins. Co., 1843, 5 Rob. 423, 442; Paddleford v. Fidelity & Casualty Co., 7 Cir., 1939, 100 F.2d 606; cert. den'd. 306 U.S. 664, 59 S.Ct. 789, 83 L.Ed. 1060; Corley v. Travelers' Protective Ass'n, 6 Cir., 1900, 105 F. 854.

The Insurance Code does not define the term, "blanket policy". Appleman describes it as follows:

"A blanket, compound, or floater policy is written upon a risk as a whole, embracing whatever articles or items are included therein, often changing in its nature; in contravention thereto, a specific policy is one which allocates the amount of the risk in stated values upon the several items embraced in the coverage." 6 Appleman, Insurance Law and Practice, Sec. 3912, p. 297.

1. The district court cited the following endorsement as "typical":

"In consideration of an additional premium of $8.79, the following locations and amounts totaling $9,500.00 are added to the schedule effective June 3, 1954, and the total insurance is increased in the amount of $8,550.00. This policy being for 30% of the total contributing insurance is increased in the amount of $2,565.00 and the policy now covers in total amount of $15,016,933.97.

830 North Tonti Street    $5,000.00
822–24 North Tonti Street    4,500.00"

One well-know definition is:

"[Blanket insurance] is one that invariably covers and attaches to every item of property described therein. If the loss of one item exhausts the whole amount of the policy, the entire insurance must be paid, and there can be no apportionment. Another definition is that a compound, or blanket, policy is one which insures property collectively without providing in the event of a loss for a distribution of the insurance to each item." Wilson and Co. v. Hartford Fire Ins. Co., 1923, 300 Mo. 1, 254 S.W. 266.

■ "Blanket policy" is "a term of art". National Bank of Burlington v. F. & C. Co. of New York, 4 Cir., 1942, 125 F.2d 920, 924, 140 A.L.R. 694, "Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong." LSA–Civ.Code, Art. 1947. Accordingly, both parties called witnesses to explain the meaning of "blanket" and "scheduled" in relation to insurance policies.

■■ The experts all agreed on the basic differences between a blanket policy and a scheduled or specific policy. All agreed that the first six pages of the policy indicate that the policy here is a blanket policy. Reliance's expert testified that, taking the policy as a whole, with the endorsements, it is a scheduled policy. The Board's experts conceded that the endorsements incorporating the schedule are inconsistent with a blanket policy, but, as we read their testimony, they found many reasons for not characterizing the policy as a scheduled policy. The witnesses were in general agreement that the statement of values, here the "Location of Schools—Statement of Values", issued by an assured in connection with a blanket policy has no relation to a scheduled policy. The schedule used in a scheduled policy lists each piece of property with the amount of insurance applicable to each. The statement of values used in connection with a blanket policy is not a part of the policy but is furnished by an assured to the Louisiana Fire Prevention and Rating Bureau and is used by the Bureau for the purpose of arriving at an average rate for a blanket policy. The Bureau's printed form used for the Statement of Values in connection with blanket policies is identical with the document entitled "Location of Schools and Statement of Values", which was annexed to the School Board's specifications for bids. An average rate usually indicates a blanket policy. In adjusting prior losses under this policy, the parties did not refer to the statement of values. The Secretary for Hardin and Ferguson, Inc., (agents for the Board and for Reliance) whom the Board called as a witness, testified that he had handled the mechanics of issuing and servicing the policy. He described the policy in suit as a blanket policy, and testified that the parties intended to insure by blanket-insurance.

Reliance argues that, as the experts testified, a blanket policy usually covers an item, or class of property, such as inventory or a stock of goods, which fluctuates in content. This policy, however, covered specifically enumerated items of property, each of which had been assigned a specific value on the valuation sheet. Second, the policy was endorsed over forty times, and these endorsements either deleted or added property and specified the value of the property. If this policy had in fact been a blanket policy, Reliance argues, the School Board could merely have asked an increase or decrease in its insurance by a stated round figure, without bothering to detail the value of the property added or deleted. Finally, Reliance points to the policy's co-insurance clause, which requires the School Board to "maintain insurance on each item of property insured by this policy of not less than ninety per cent of the actual cash value thereof." Each item of property refers, it insists, to each piece listed in the valuation sheet and the later endorsements to the policy; each item listed was therefore insured for 90 per cent of the amount assigned

to it in the schedule, and not for $57,-800,000, the face amount of the policy.

Counsel for appellant argues ably and forcibly, but we find countervailing considerations which persuade us that the parties intended what the special form plainly stated—"School Form—Blanket" policy. Over 350 pieces of property were listed on the valuation sheet submitted with the bid specifications and in three years over forty changes in the property covered were made by means of endorsements to the policy. This is surely some indication that the risk covered by the policy did comprise one item, i. e., the global aggregate of the insured property owned by the School Board of Orleans Parish.[2] This was subject to relatively frequent changes in content, and was thus of a type suitable for coverage by a blanket policy. Moreover, the fact of a specific listing of separate pieces of property and their value was not at all inconsistent with the blanket policy as written. This was essential, initially, in order for the bidders to compute the average insurance premium. Later, the statement of values and separate endorsements, which listed the specific value of the property added or deleted, continued to be necessary for the purpose of determining the insured's compliance with the ninety per cent co-insurance clause.

Indeed, if the policy had been a specific or scheduled one, the School Board would have been charged a premium determined by the risk involved in insuring each additional piece of property on the endorsements, rather than the average rate which, in fact, was charged in each instance. A similar point can be made with reference to the statement of values. The amounts in the statement set opposite each separate property are not the amounts of insurance coverage afforded by the fifty per cent policy, but the full value of each building. This is more in accord with the nature of a blanket than a scheduled policy.

The wording of the co-insurance clause does not compel a different conclusion. It does, it is true, refer to "each item of property insured by this policy," but the part of the policy describing the property insured shows only one item described: "As per form attached." The clause required insurance coverage of 90 per cent of the total value of all the property, and in order for the insurance company to determine whether this clause had been complied with, it was necessary that it have the information as to value of the property contained in the schedule and the endorsements.

We hold that the district court did not err in its construction of the policy as a blanket policy.

## II.

■ The second point Reliance raises is that the district court erred in holding that no deduction should · be made from replacement cost on account of accrued depreciation of the Landry School building. It urges that this ruling is not warranted by the Louisiana Valued Policy law or the Louisiana cases.

■ The rule in Louisiana, as to both movable (personal) and immovable (real) property, is that liability under a fire policy can in no event exceed the amount for which the property is insured. Lake Arthur Dredging Co. v. Mechanics' Ins. Co., 1927, 162 La. 1090, 111 So. 466; Young v. Fireman's Fund Ins. Co., 1926, 160 La. 275, 107 So. 108; Brough v. Presidential Fire & Marine Ins. Co., Orl.App.1937, 176 So. 895, 905, annulled on other grounds, 1938, 189 La. 880, 181 So. 432; Chambers v. North British & Mercantile Ins. Co., La.App. 1–1937, 175 So. 95; Hinson v. British American Assur. Co., W.D.La.1942, 43 F.Supp. 951.

The Louisiana Valued Policy statute stipulates that "in case of partial damage," the insurer shall pay "such amount * * * as will permit the insured to re-

---

2. Here there was only one item: "* * * all property [of the Board] of every kind and description, both movable and im- movable." The total amount of coverage is shown alongside that item.

store the damaged property to its original condition." LSA–R.S. 22:695, subd. B. At least one commentator has construed this provision to authorize "payment to the insured of a sum sufficient to permit him to restore the damaged property to its original condition at the time of loss, thus codifying the replacement-cost-less-depreciation test." Note, Valuation and Measure of Recovery Under Fire Insurance Policies, 49 Columbia L.Rev. 818, 828 (1949). The Louisiana Supreme Court, in dictum, has reached the same conclusion. In Lake Arthur Dredging Co. v. Mechanics' Ins. Co., 1927, 162 La. 1090, 111 So. 466, 469, the state court, although holding that the statute was inapplicable to a dredge, stated,

> "[s]o that, if the present policy could be brought within the terms of the valued policy statute as above referred to, there being only a partial damage, the only alternative left to the defendant would be to pay the insured the full par value of the policy, for, as shown by the admission and proof of loss, it would take more than that amount to restore the property to its original condition *at the time of the fire."* (Emphasis supplied.)

In an earlier case, Stenzel v. Pennsylvania Fire Ins. Co., 1903, 110 La. 1019, 35 So. 271, where the loss occurred before Louisiana enacted its Valued Policy Law, the Supreme Court held that "[i]n determining the value of the insured property, in adjusting the loss under a fire insurance policy  *  *  * the aim must be to arrive as near as possible at the value of the insured property as it stood on the day of the fire, taking into consideration what would be the cost of rebuilding, and allowing for difference in value between the buildings new and in the condition in which they were when destroyed." (Syllabus by the Court.) The Court allowed an estimated "deterioration" of ten per cent.

The replacement-cost-less-depreciation standard is the rule applied by most courts in determining the insurance owed in cases of partial loss.

> "The majority rule provides that the insured is to recover the cost of restoring the damaged structures to their condition immediately before the fire. The actual computation is made by considering the present value of the damaged portion and the extent of destruction, and subtracting therefrom an appropriate amount for depreciation." Note, Valuation and Measure of Recovery Under Fire Insurance Policies, 49 Columbia L.Rev. 818, 825–26 (1949).

This would, indeed, seem to be the common-sense rule. Insurance which covers the full cost of repair or replacement, without deduction for assured depreciation is available at a higher premium. If the insured property is in a decayed condition at the time of a fire which necessitates substantial rebuilding, the insurer should not be forced to pay for erecting what is in effect a new building, or even for appreciably extending the normal life of the old building. If, on the other hand, the portion damaged has little or no structural significance, there would be no compelling reason for considering depreciation. Note, Valuation and Measure of Recovery Under Fire Insurance Policies, 49 Columbia L.Rev. 818, 826 (1949).

Several of the Louisiana cases cited by the School Board are justified under this latter rationale. Thus, in Ware v. American Druggists' Fire Insurance Co., La.App.1949, 38 So.2d 531, the cost of restoration was only $243.00, which was for fresh paint, reconditioning a water heater, carpenter work and materials. Except for some weather boarding which had been removed, the only damage was to a hot water heater and the building's paint, which had been discolored by smoke. In such a case, depreciation might well not be an appropriate item for consideration. In Brocato v. Sun Underwriters Ins. Co., 1951, 219 La. 495, 53 So.2d 246, 29 A.L.R.2d 629, a case involving hurricane damage, the court did indeed refuse to allow a reduction

in recovery to take account of the building's run-down condition, but that case involved a windstorm policy, not governed by the Louisiana Valued Policy Law. Moreover, the court pointed out that the building "was no doubt in the same condition when the policy was issued just six months before the storm." 53 So. 2d at 250. The other cases cited by appellee in support of the lower court's holding, such as Aycock v. Republic Ins. Co., La.App.1959, 116 So.2d 317, 74 A.L. R.2d 1267, give no indication that the question of depreciation was raised.

■ The Valued Policy Law of Louisiana does not apply to movable (personal) property. The provisions of the standard (statutory) Louisiana fire policy, therefore, determine the extent of liability for loss of the contents of the Landry School building. LSA–R.S. 22:-691. The standard, statutory, form of fire policy for Louisiana provides insurance "to an amount not exceeding * * dollars", to the extent of the "actual cash value of the property at the time of loss." LSA–R.S. 22:691.

Although the Louisiana law on this issue is not settled, what law there is seems to indicate that in case of a partial loss depreciation must be considered in determining an insurer's liability on a fire insurance policy.

### III.

■ The School Board has filed a cross-appeal, urging that the district court erred in refusing to award interest from December 30, 1958, which was sixty days after the proofs of loss were filed. Relying upon Gettwerth v. Teutonia Ins. Co., 1877, 29 La.Ann. 30 and Stovall v. Empire State Ins. Co., 1949, 215 La. 100, 39 So.2d 837, the district court held that interest should run only from the date of judicial demand, March 3, 1959. This ruling is supported by the decisions cited.

Although the court in Stovall merely stated that the lower court had rendered judgment with legal interest from the date of judicial demand and did not discuss the point, there was no indication that this was not the usual rule. In Gettwerth, however, the Louisiana Supreme Court expressly held that the interest should have ben allowed only from the date of judicial demand, and not from sixty days after proof of loss. Appellee cites Isadore v. Washington Fire & Marine Ins. Co., La.App.1954, 75 So. 2d 247, in support of its contention. There a Louisiana court of appeals held that interest should run from sixty days after proof of loss rather than from the date of loss. It is not shown, however, that the insurance company in that case raised before the court the third possibility with which we are here concerned: that interest should run from the date of judicial demand. Gettwerth is, therefore, the only Louisiana case which considers the issue directly. The trial judge did not err in following it.

### IV.

■ Finally, the School Board urges that the trial judge should have held that Reliance is liable for the statutory penalty plus attorney's fees. LSA–R.S. 22:658 provides in part:

"Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured * * * together with all reasonable attorney's fees * * *. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees."

Whether the insurance company's refusal to pay was so lacking in foundation or cause as to fall within the terms of the statutory penalty is primarily a question of fact. Here the trial judge found that the company had evidenced good

faith by depositing a substantial sum in the court's registry, cf., New v. Union Automobile Ins. Co., La.App.1932, 141 So. 416, and that he could not "with assurance say that the insurer's conduct is 'arbitrary, capricious or without probable cause' within the intendment of this penal statute." We would make the same educated guess that this is the standard Louisiana courts would apply in such a case as this. See Finley v. Hardware Mutual Ins. Co., 1959, 237 La. 214, 110 So.2d 583; Aycock v. Republic Ins. Co., 1959, 116 So.2d 317, 74 A.L.R. 2d 1267. The lower court's finding is supported by sufficient evidence and will not be overturned on appeal.

Summarizing, we affirm the district court's holding that the policy in suit was a blanket policy; we reverse the holding that depreciation need not be considered in determining the appellant's liability on the policy; we affirm the holdings that interest runs from the date of judicial demand and that Reliance's refusal to pay was not so lacking in cause as to justify imposition of statutory penalties.