MULLER ENTERPRISES, INC., APPELLEE AND CROSS-APPELLANT, v. SAMUEL M. GERBER ET AL., APPELLEES AND CROSS-APPELLEES, IMPLEADED WITH SAMUEL GERBER ADVERTISING AGENCY, INC., APPELLANT AND CROSS-APPELLEE.

133 N. W. 2d 913

Filed March 19, 1965. No. 35845.

Howard B. Westering, for appellant.

Haney, Walsh & Wall, for appellee Muller Enterprises, Inc.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

WHITE, C. J.

This case is concerned with the validity of a "finder's fee" contract. Plaintiff, a corporation, and Robert Muller will be hereinafter referred to as plaintiff or Muller. Defendants Samuel M. Gerber and Samuel Gerber Advertising Agency, Inc., a corporation, will be hereinafter referred to as defendant or Gerber. Plaintiff, organized by Robert Muller and associates, introduced the Service Life Insurance Company to defendant, Samuel Gerber Advertising Agency, Inc., which thereafter, under an arrangement with Ajon Farber, executive vice president of Service Life, advertised a certain hospitalization policy (exhibit 20), in various magazines and news media. The advertising format agreed upon by Farber and Gerber contained a coupon for a reader to sign and send in with a $1 premium payment as an application for 60 days coverage. The acceptance by the company of the application and the issuance of a policy for 60 days constituted a "closure." For each closure,

Gerber received $10. If the policy was continued in force after 60 days by a renewal premium, this constituted a "renewal" and Gerber was to receive $5 for the first renewal, none thereafter. For introducing Service Life to Gerber, plaintiff claims 10 percent of the original $10 closure fees and 10 percent of the $5 renewal payment. Many thousands of closures were made as the result of Gerber's advertising. After paying plaintiff (Muller) $1,653 for closures, no renewals, for a period of 12 to 14 months, defendant Gerber ceased all payments and refused to make any payments to plaintiff on the finder's fee agreement of December 8, 1960. The trial court found there was a valid and binding agreement to pay 10 percent of the closure fees received by Gerber, none on renewals, and referred the matter to a referee for an accounting of the balance due on the closure fees received by Gerber. The referee's report found there was due plaintiff a balance of $10,926.80, being the closures from March 1961, through December 1963, and the district court entered judgment accordingly.

Plaintiff was a promoter of insurance merchandising ideas, and the defendant was an advertising agency. In a series of correspondence and a conference between September and December 5, 1960, Muller developed and tried to sell Ajon Farber and Service Life a scheme for Muller Enterprises, the plaintiff, to advertise its insurance. Farber rejected Muller's plan, but upon return to Omaha wrote Muller a letter on December 5, 1960, outlining a proposal in which Service Life would be interested. Muller learned that Service Life wanted to expand the advertising and sales of its standard hospitalization policy (exhibit 20), and that if anybody would finance the cost of such advertising the company would pay $10 when a policy was issued to a subscriber who clipped a coupon and sent $1 with it for 60 days coverage, and $5 if the policy so issued was renewed at the end of 60 days. In this letter, Farber stated: "If a mail order organization will solicit this policy, for each

bonafide application we receive along with an initial premium, we will pay $10.00. If the policy renews for two successive terms of coverage on a monthly premium plan or if the policy renews for one successive term on a quarterly semi-annual or annual plan we will pay an additional $5.00. It is as simple as that. * * * If you have people who are interested in this sort of venture who have the know-how and where-with-all, it is a fine opportunity for you to partake in a fair return and a profitable venture." During the period before this letter, Muller had contacted Gerber and discussed with him whether he would be interested in doing some advertising for an insurance company on a "per lead" basis. After the conversations of these parties, and with this background present and the proposal in Farber's letter, of December 5, 1960, Muller met with Gerber in Boston where they both lived and had offices. From these preliminary conversations, Muller's understanding with Gerber had reached the point where he and an associate took with them a proposed written contract covering what Muller was to receive if Gerber took on the project outlined in the letter of December 5, 1960. Muller had not disclosed the name of the insurance company in any of the preliminary conversations with Gerber. After discussion, Gerber rejected Muller's contract, personally drew and typed exhibit 2, leaving the name of the insurance company blank, signed it on behalf of the defendant, and handed it to Muller. This was on December 8, 1960. Muller then signed it for the plaintiff and *then filled in the name of the Service Life Insurance Company in the blank that Gerber had provided in the contract.* This was the first time Gerber knew the name of the company that was offering the proposal that had been generally discussed before. This instrument, exhibit 2, is is follows:

"It is my understanding that you will introduce this firm to a certain insurance company, (fill in name here

and initial), The Service Life Insurance Company of Omaha Nebraska, to set up a deal to secure leads or closures on a certain insurance program, namely, one in which this insurance company makes an offer of 60 days insurance with various coverages for $1.00., and should these materialize into further business for this insurance company, as renewing the policy for a year for $15.00 with similar coverages, as part of the promotion.

"Leads or closures is to be defined as customers sending in the one dollar for the 60 day package deal only, and as a result of delivering these types of orders, said insurance company will pay a certain amount of money for each lead or closure. As I understand it, said insurance company will also pay an additional sum for each subsequent renewal obtained from the original lead or closure.

"Muller Enterprises, Inc., will be paid a fee of 10% for introducing this agency to said insurance company. The 10% fee will be based on the amount said insurance company will pay for each lead or closure on the $1.00 deal, provided this deal can be worked and is acceptable to this agency and said insurance company, and the amount of money to be paid for each lead or closure is agreed upon.

"Payments for leads or closures are to be paid to this agency, who will in return pay Muller Enterprises, Inc., the standard fee agreed upon of 10%."

The above letter was signed and accepted by the defendant and was signed and accepted by the plaintiff.

On December 8, 1960, immediately after signing exhibit 2, Gerber and Muller talked to Farber in Omaha by phone in a three-way conversation. Gerber was satisfied by what Farber stated, which confirmed the general plan outlined to Muller in the letter of December 5, 1960. Other necessary details were discussed and Gerber and Farber "set up a deal" contemplated by the

language of exhibit 2. In the days following there were many conversations between Gerber and Farber concerning details and various phases of the set-up. An understanding was reached early in 1961 and Gerber commenced advertising in various magazines the policy coverage of exhibit 20, referred to in the record variously as DM37B. Approval of copy, Gerber's right to exclusive coverage, difficulties as to what states could be covered, where the money and coupons could be received under the law, and many other matters were ironed out with Farber entirely by phone.

Until March of 1962, but not thereafter, Gerber paid plaintiff monthly the 10 percent of the $10 "policy closure" payments, aggregating a sum of $1,653. About March 1962, after a dispute with Muller as to whether exhibit 2 called for payments to Muller of 10 percent of renewal commissions, Gerber refused further payment saying, " 'that's right, I am not making any money with Service Life; I was told I didn't have to pay you anything, anyway. * * * Besides that, I have sold the business.' " Gerber did continue advertising; receiving money for "closures," and the report of the referee, not challenged by either party here, shows a balance of $10,926.80 due on 10 percent of the "closures," without renewals.

Defendant's contention is two-fold. He claims that exhibit 2 does not constitute a contract and that if it did, he is entitled to rescind for fraud and mistake. There seems no dispute that this is a Massachusetts contract, and that the law applicable to the essentials of a contract is the same in both Massachusetts and Nebraska. In George W. Wilcox, Inc. v. Shell Eastern Petroleum Products, Inc., 283 Mass. 383, 186 N. E. 562, it is stated: "In order that the plaintiff may recover, the instrument relied on must be found to state the essential terms of a contract, by which the parties intended to be bound, with sufficient definiteness and clarity that a court, by interpretation with the aid of existing and

contemplated circumstances, may enforce it. Lyman v. Robinson, 14 Allen, 242, 254. Beach & Claridge Co. v. American Steam Gauge & Valve Manuf. Co., 202 Mass. 177, 182. Kaufman v. Lennox, 265 Mass. 487."

We have no difficulty in reaching the conclusion that exhibit 2 constituted a valid and binding contract between the parties. Gerber drew the instrument himself. It was not changed in a single respect by Muller. It was drawn from the mutual background of conversations and understandings referred to generally above in the review of the evidence. It reflected Gerber's intentions. Its fair, and we think, clear import was that if Gerber could set up a deal with the insurance company (name to be filled in) that was satisfactory to him as to advertising a specific type of policy, that Muller was to be paid for introducing or making the contact. By its terms Muller was to be paid his 10 percent *"for introducing this agency to said insurance company."* (Italics supplied.) There were no other services or work that Muller was to do.

Gerber himself, in drawing the contract, left the name blank, recognizing that when Muller supplied the name, he would then have performed and executed his part of the contract. Gerber himself had clear enough understanding of the deal to provide the method of computing the 10 percent fee. The type of policy (exhibit 20) was sufficiently described in the context as to occasion no difficulty or objection by Gerber during his successful "setting up" of the advertising program with Farber of Service Life. This instrument, exhibit 2, was an offer by Gerber setting up his own terms, which was accepted without change by Muller. Neither Muller or Gerber did know what specific arrangement or advertising program could be "set up" with Farber. The contract said so. Gerber was obligated to do nothing. If he did make a deal to advertise the policy described, he would be obligated to pay 10 percent for Muller introducing him to Farber and Service Life. That was the

intent of the contract as expressed, and which he himself drew and we can see no ambiguity or lack of mutuality in it.

But our determination in this respect does not rest on these grounds alone. The law of Massachusetts is substantially the same as we stated in McLeod v. Crawford, 176 Neb. 513, 126 N. W. 2d 663, wherein we said: "It is to be assumed that parties to a contract *know best what was meant* by its terms, and that whatever is done by the parties *during the period of performance is done as they intended it should be*. The interpretation given a contract, by the parties themselves while engaged in their performance of it, is one of the best indications of *their true intent,* should be given great, if not controlling influence, and the courts ordinarily should enforce such construction. Dunn v. Mutual Ben. Health & Acc. Assn., 135 Neb. 506, 282 N. W. 487; 12 Am. Jur., Contracts, § 249, p. 787; C. W. Hull Co. v. Westerfield, 107 Neb. 705, 186 N. W. 992, 29 A. L. R. 105; 4 Neb. Law Bulletin 149; Ord Hardware Co. v. J. I. Case Threshing Machine Co., 83 Neb. 353, 119 N. W. 682. Correlated to and following this basic principle is the rule that the assertion of the invalidity of a contract is nullified by the subsequent *acceptance of benefits growing out of the contract* claimed to have been breached. Wegner v. West, 169 Neb. 546, 100 N. W. 2d 542; Einot, Inc. v. Einot Sales Co., Inc., 154 Neb. 760, 49 N. W. 2d 625; Dakota County v. Central Bridge & Constr. Co., 136 Neb. 118, 285 N. W. 309." See, also, Atwood v. City of Boston, 310 Mass. 70, 37 N. E. 2d 131; Ryerson v. Fall River Philanthropic Bur. Soc., 315 Mass. 244, 52 N. E. 2d 688; Crowe v. Bixby, 237 Mass. 249, 129 N. E. 433.

At the time exhibit 2 was signed, Muller, Gerber, and Farber had a mutual telephone conversation. As a result of this and subsequent conversations with Farber, Gerber did "set up" a deal with Service Life. Difficulties were ironed out. Gerber, although not obligated, did advertise a policy (exhibit 20), in an increasing number

of magazines, received the $10 "closure" commission, and until March 1962, paid Muller 10 percent of the closure fees he received from Service Life. We will not review the evidence further. It shows that Gerber, by his performance, accepted benefits under the arrangement contracted for in exhibit 2, recognized his obligation by paying according to its terms, and increased the extent of the program and closures as time went on. In fact, the program was inviting enough that at about the time he cut off the Muller payments, he made arrangements with other parties so that he could enlarge the program and finance additional advertising. Under the evidence in this case, defendant is estopped by his own conduct in the performance of the contract to deny the validity and enforceability of the contract (exhibit 2), drawn by himself. Defendant argues extensively that the contract is uncertain because Muller demanded payment of renewal commissions in addition to the original closures. The fact that Muller misinterpreted the contract or claimed more than its terms provided does not affect the mutuality or validity of the original contract. The lower court rejected Muller's claim in this respect, held his recovery to 10 percent on the original closures as was correct according to the express terms of exhibit 2. Muller cannot be penalized for overstating his claim either to Gerber or in his pleadings in this case.

Defendant contends that the contract is void because of lack of mutuality and indefiniteness as to the termination date of the contract. Gerber's own wishes determine this. His only obligation is to pay Muller 10 percent for as long as he himself performs the contract. If it becomes unprofitable or onerous, all he has to do is quit. He reserved exclusive control of the time element himself when he drew the contract and he cannot be heard to complain of the fact that he himself did not terminate it. To hold otherwise would be to permit the receipt of continuous benefits under a contract without payment of the corresponding obligation. We point out

that the contract by its terms together with the conduct of Gerber in paying, conclusively show full performance by Muller. The contract is executory on Gerber's part and it seems to us that it clearly contemplates that the duration of the obligation is commensurate with Gerber's performance, which he may terminate at any time. Dispositive of this contention under Massachusetts law is the case of Phelps v. Shawprint, Inc., 328 Mass. 352, 103 N. E. 2d 687. In that case, the defendants promised to pay to the plaintiff $100 per month so long as a third party should be connected with one of the defendants, if the plaintiff would succeed in having the third party acquire stock in defendant corporation. Plaintiff thereafter performed but the defendants breached the contract contending, as here, lack of mutuality in the contract as to a termination date. The court said: "The contract was not silent on this aspect for it carried its own measure of time. It definitely specified that it was to continue so long as the Rosenbaums were connected with the corporation. Such a contract is not too indefinite or uncertain to be enforceable at least for partial breaches even though it is impossible to predict precisely when the contingency will occur that will bring the contract to an end. * * * Contracts to continue, not until a fixed date but until the happening of an event which is certain to occur sooner or later, have been enforced. * * * Where, as here, the contract has been fully performed on one side, 'the law will not permit the injustice of the other party retaining the benefit without paying unless compelled by some inexorable rule.' Silver v. Graves, 210 Mass. 26, 30. * * * In Raymond v. White, 119 Mich. 438, the defendants agreed to pay the plaintiff a stated sum each week so long as they used his patented devices. The contract fixed no definite time for its duration. The defendants were bound to pay in accordance with the contract so long as they used the plaintiff's devices. The plaintiff recovered a weekly payment due and un-

paid at the time he brought his action. The instant contract was fully executed upon the part of the plaintiff and the only portion remaining executory was that imposed upon the Rosenbaums. Their failure to make the stipulated payments constituted successive breaches of the contract." There is no merit to this contention.

Defendant by answer and cross-petition pleads fraud and mistake and asks rescission of the contract. Fraud and mistake are never assumed, but must be proved by the party that alleges them. Caruso v. Moy, 164 Neb. 68, 81 N. W. 2d 826.

Gerber testified as to representations by Muller that he controlled the advertising and promotional account of Service Life; that the policy to be advertised had a certain renewal premium; that all magazines could be advertised in; that there was a certain persistency percentage of renewals after the original closures; and that the money and responses to the ads would come to him in Boston, and various other statements too numerous to review in this opinion. The evidence shows that these claimed misrepresentations rest almost entirely on the uncorroborated testimony of the defendant. They are all denied by the plaintiff. Nothing was said about these matters in the contract Gerber himself drew. The scope of Muller's obligation and representations was to introduce Gerber to Service Life and then Gerber would make a deal about advertising a particular type of policy. This he did. Any claimed misunderstandings as to policies, premiums, renewals, or control of advertising were immediately cleared up with Farber of Service Life. His continuing and mutually satisfactory arrangement with Service Life and Farber, and his continuing performance of the advertising program and payments to plaintiff, are inconsistent with claimed misrepresentations. We feel further that the evidence fails to show the materiality of any of these representations or that they induced any of the defendant's acts. If there were any misrepresentations or misunderstandings, the scheme in the con-

tract defendant drew himself provided that he only had to rely on and be induced by whatever deal he could make with Farber that was satisfactory to himself.

The defendant has failed to meet his burden of proof as to the issues of fraud and mistake. Also, the trial court saw and heard the witnesses and this court will consider the fact that it accepted the plaintiff's version of the facts on this issue. Holbein v. Holbein, 149 Neb. 281, 30 N. W. 2d 899; Clough v. Clough, 132 Neb. 748, 273 N. W. 31. The trial court was correct in rejecting this defense and dismissing the cross-petition.

We therefore hold that the decree of reference of August 23, 1963, holding defendant liable for 10 percent of leads or closure fees received from Service Life but not for renewals or other advertising services rendered, is correct and should be affirmed. The judgment for $10,926.80 of April 13, 1964, based on the report of the referee as to amounts due for "closures" to the date therein indicated is affirmed.

We go to the issues raised on the cross-appeal. On February 27, 1964, after the decree and order of reference, Gerber and Service Life entered into a new advertising contract. On March 6, 1964, Gerber filed a motion in the action asking for approval of this contract and a finding that it excluded any further liability to plaintiff. The court partially sustained this motion, finding that any bona fide transaction entered into pursuant to the new agreement would not be subject to the original contract entered into and enforced in the original decree of August 23, 1963. This was error since there was no justiciable issue under the petition or pleadings in the case to determine the effect or validity of a subsequently drawn contract between Gerber and Service Life. This judgment as to the effect of this new contract, drawn designedly to terminate the liability substantively established in the decree of August 23, 1963, was purely advisory in nature, a judgment not responsive to the issues raised by the pleadings, inconsistent with the pre-

vious judgment of the court, and not within its jurisdiction. See, Noble v. City of Lincoln, 153 Neb. 79, 43 N. W. 2d 578; Bowman v. Cobb, 128 Neb. 289, 258 N. W. 535.

By cross-appeal, plaintiff alleges that it is entitled to interest from date due of each of the payments for leads or closures found due by the decree and final judgment. We hold this was an unliquidated claim and interest runs only from the date judgment is rendered fixing the amount due. From the inception of this dispute and throughout the litigation, the plaintiff has contended that he is entitled to 10 percent of renewal commissions and of all money collected by Gerber from Service Life for advertising. This dispute was unresolved until the court found that the plaintiff was entitled to recover only 10 percent of the payments for leads and closures, and not renewals. We think the following from Colvin v. John Powell & Co., Inc., 163 Neb. 112, 77 N. W. 2d 900, is applicable: " 'Recovery of interest on an unliquidated claim, the subject of reasonable controversy, and incapable of being fixed by computation, may be had only from the date of determination of the right of recovery and the ascertainment of the amount. National Fire Ins. Co. of Hartford v. Evertson, 157 Neb. 540, 60 N. W. 2d 638."

In light of our holding herein, we deem it unnecessary to discuss the other matters raised in the briefs of the parties.

The judgment is affirmed in part, and in part reversed and remanded for further proceedings in accordance with this opinion.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.