**CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, a Nebraska Corporation, Appellee-Appellant,**

v.

**DEVONSHIRE COVERAGE CORPORATION, a California Corporation, Appellant-Appellee.**

Nos. 76–1768, 76–1718.

United States Court of Appeals,
Eighth Circuit.

Submitted April 13, 1977.

Decided Nov. 8, 1977.

---

John W. Morrison, Karon, Morrison & Savikas, Chicago, Ill., for Devonshire Coverage Corp.; Victor G. Savikas and Stephen J. Spitz, Chicago, Ill., on brief.

Frank Matthews, Omaha, Neb., for Central Nat. Ins. Co. of Omaha; Martin A. Cannon of Matthews, Kelley, Cannon & Carpenter, Omaha, Neb., on brief.

Before LAY, WEBSTER and HENLEY, Circuit Judges.

WEBSTER, Circuit Judge.

On October 27, 1973, the clubhouse at the Drexelbrook Apartments in Upper Darby, Pennsylvania, was substantially destroyed by fire. The property was insured by appellant, Central National Insurance Company. In a subsequent indemnity action brought by Central National against its general agent, Devonshire Coverage Corp., the District Court[1] held that because Devonshire had breached a provision of its agency agreement requiring it to purchase reinsurance on the apartment complex, it was liable to Central National for that portion of the loss which would have been covered by reinsurance had it been obtained. After making offsetting adjustments, the District Court entered judgment in favor of Central National in the sum of $806,-473.54. Both parties appeal.

### The Agency Agreement

On February 1, 1970, Devonshire became a general agent of Central National, with authority to market fire and allied lines, and special multi-peril policies. The agency agreement was drafted by Central National, and was to be "subject to and construed under the Laws of the State of Nebraska." By oral agreement, Devonshire was not to obligate Central National to any single risk valued in excess of $1,000,000, unless Dev-

---

1. The Honorable Richard E. Robinson, United States District Court for the District of Nebraska.

onshire provided reinsurance on that portion of the risk in excess of $1,000,000. Under this arrangement, known as excess-of-loss reinsurance, Central National would be liable for the first $1,000,000 of any loss, but the reinsurer would be liable for any excess; Central National's potential liability was thus limited to that amount.

By a written addendum to the agreement, dated November 30, 1972, the circumstances in which reinsurance was to be obtained were modified. The addendum provided:

\* \* \* \* \* \*

2. With respect to risks incepting on or after December 1, 1972, the General Agent will not write risks in excess of $500,000 total sum insured for any one risk (irrespective of the PML) unless reinsured as follows. Should the amount of the total sum insured on any one risk exceed $500,000 then the excess over the above mentioned $500,000 limitation must be reinsured on a pro rata basis, not on an excess of loss basis, with financial [sic] sound and reputable reinsurers.

\* \* \* \* \* \*

Devonshire agreed to indemnify Central National against all liabilities resulting from violations of the addendum's limitations, or for any failure to provide reinsurance.[2]

### The Helmsley-Spear Policy

On October 20, 1972, Helmsley-Spear, Inc. requested Devonshire to submit a quotation for insurance on the Drexelbrook Apartments, a complex consisting of ninety, two-story apartment buildings, a shopping center, swimming pool, and a club. In its letter of inquiry Helmsley-Spear assigned the clubhouse and its contents a value of $850,000, with possible business interruption loss of $150,000, and loss of rents of $100,000. The value assigned to the entire complex totaled $9,350,000, with an additional $1,430,000 for loss of rents and business interruption.

Thereafter, Helmsley-Spear was issued Central National policy SMP 59 83 77, a "special multi-peril policy" covering the Drexelbrook complex and four other locations. In a "supplemental declaration endorsement" attached to the policy, each location was assigned a value; the total value assigned to the Drexelbrook location ($9,190,000 building and $160,000 contents) was identical to that submitted by the insured in its request for a quotation. The sum of the values listed, $26,284,447, was given as the "limit of liability" under the policy. There was no co-insurance.[3]

In late December 1972, when the Helmsley-Spear policy was written, Central National was pressuring Devonshire to do as much business as possible before year's end. In consequence Devonshire, which had basic responsibility for underwriting under the agency agreement, approved some policies and forwarded them to Central National without the usual supporting material. The Helmsley-Spear policy was forwarded without reinsurance being obtained. Supporting engineering reports were also missing. Central National accepted and retained the full premium on the policy.

In early 1973, it came to the attention of W. M. Dickson, Central National's Assistant Underwriting Manager, that reinsurance had not been obtained. He wrote Russell McFarren, Devonshire's vice-president in charge of underwriting:

2. Under pro rata reinsurance as referred to in the agency agreement, the reinsurer shares in any loss from the first dollar. The total loss is shared between the insurer and reinsurer in proportion to their respective shares of the coverage.

3. The policy did contain a 90% coinsurance clause. It also contained a "stipulated amount" endorsement, wherein the liability of the company was limited to "no greater proportion" of the loss "than the amount hereby insured bears to the stipulated sum of $26,284,447 . . . ." Because the policy's liability limit was equal to the stipulated amount, the endorsement did not in any way limit Central National's liability for loss. In the undisputed judgment of Central National's insurance counsel, the effect of the endorsement was to waive the coinsurance penalty that would otherwise have been applicable, since Helmsley-Spear insured the properties for considerably less than 90% of the actual value.

We have now received the report on the Club House, which is location # 1 on the policy, and note that the report indicates that it is valued at $850,000 and is 100% insured.

Since this policy is effective on December 31, 1972, it is my understanding that the maximum limit on any one risk written by your office would be $500,000.

I would appreciate your review of this and letting us have your advice and any necessary Reinsurance Certificate as soon as possible. Thank you.

Devonshire never obtained any reinsurance on the Helmsley-Spear policy. Central National never followed up on Dickson's February 6 letter, and likewise never obtained the reinsurance discussed therein.

*The Loss, Adjustment, and Settlement*

The fire occurred on October 27, 1973. Shortly thereafter, Devonshire retained George Day, a private insurance adjustor. Day visited the scene of the loss and took an active role in negotiating a settlement. He made eight reports, seven of which were sent to both Devonshire and Central National, and one directly to Central National. The reports sent to Devonshire were reviewed by Devonshire's claims vice-president, Alfred Christensen, from October, 1973, onward.

Central National ultimately paid, in settlement, the following amounts:

| | |
|---|---|
| Building | $ 778,782 |
| Contents | 160,000 |
| Rents and Earnings | 160,000 |
| Replacement Cost | 144,385 |
| | $1,243,167 |

In addition, Central National paid adjustment expenses of $1,242.83 to Devonshire and $31,759.56 to others, for a total cost to it of $1,276,109.39.

On March 28, 1974, the day after the meeting at which a settlement agreement was reached, Gordon of Central National conferred by telephone with Christensen, who had received Day's reports. Christensen agreed that the settlement proposed was "the best possible loss settlement available to us."

During the course of adjusting the loss, it had become apparent that the values submitted by the insured requesting the original quotation were substantially below the actual values of the Drexelbrook complex. A post-loss appraisal obtained by adjustor Day showed that the entire complex had an insurable value of $19,267,775 before the fire, rather than the $9,190,000 set out in the insured's letter, and that the clubhouse itself had an insurable value of $1,188,867, rather than $850,000. Central National chose to forego any defense to the policy on the basis of misrepresentation, however, and elected instead to enter the settlement.

*The Issues on Appeal*

Central National thereafter sued Devonshire, claiming indemnity under the agency agreement for Devonshire's failure to procure reinsurance. The District Court found a breach of the duty to reinsure, and entered judgment for Central National in the amount of $806,473.54.

Both parties appeal. Devonshire contends: (1) that any breach of the duty to reinsure and to indemnify was waived by acquiescence; (2) that Central National is barred from recovery because it had a valid defense against its insured and failed to tender that defense to Devonshire or to establish its own actual liability at trial; (3) that the damages were improperly computed; and (4) that the Court erred in ruling on discovery matters. Central National, cross-appealing, contends: (1) that damages were improperly computed; and (2) that it was entitled to prejudgment interest.

I.

DEVONSHIRE'S DEFENSES

Central National's theory of liability is straightforward: Devonshire agreed that if a policy were written on any one risk exceeding $500,000, it would obtain pro rata reinsurance; the Drexelbrook clubhouse was such a risk; Devonshire breached the terms of the agreement by failing to procure the reinsurance; Devonshire was

therefore obligated by its contract to indemnify Central National. Devonshire concedes that reinsurance was required by the contract and was not obtained. It contends, nonetheless, that it has defenses to liability.

### Acquiescence

After Dickson's letter of February 6, 1973, Central National made no further inquiry of Devonshire concerning reinsurance on the Helmsley-Spear policy. Devonshire contends that Central National thereby acquiesced in the failure to acquire reinsurance, so that its right to sue for breach of contract was defeated.

The doctrine of acquiescence as a defense to indemnity arose originally in cases in which the right to indemnity was based, not on contract, but on principles of restitution. See Pennsylvania R. R. Co. v. Erie Avenue Warehouse Co., 302 F.2d 843, 848 (3d Cir. 1962). The right to indemnity arose in such cases when a person became liable to a third party for a dangerous condition, and as between the first person and a second party, it was the second party's duty to make the condition safe. The duty of the second party to indemnify the first was held to be waived if the first party acquiesced in the continuation of the dangerous condition. Restatement of Restitution § 95 (1937).

In several FELA decisions, it has been held that acquiescence in the continued existence of a dangerous condition can bar indemnity for injury to a third person even where the parties expressly contract for indemnity. See Rouse v. Chicago, Rock Island & Pacific R. R. Co., 474 F.2d 1180, 1183 (8th Cir. 1973); Missouri Pacific R. R. Co. v. Arkansas Oak Flooring Co., 434 F.2d 575, 577–80 (8th Cir. 1970); Pennsylvania R. R. Co. v. Erie Avenue Warehouse Co., supra, 302 F.2d at 848; cf. Missouri Pacific R. R. Co. v. Winburn Tile Mfg. Co., 461 F.2d 984, 989 (8th Cir. 1972); Anthony v. Louisiana & Arkansas Ry. Co., 316 F.2d 858 (8th Cir. 1963) (defense can be precluded by explicit terms of indemnity contract). The rationale for these decisions is that the indemnitee's conduct in acquiescing in the dangerous condition is blameworthy apart from the conduct of the indemnitor, and therefore restitution cannot be viewed as within the scope of a contract to indemnify. See Missouri Pacific R. R. Co. v. Winburn Tile Mfg. Co., supra, 461 F.2d at 989; Pennsylvania R. R. Co. v. Erie Avenue Warehouse Co., supra, 302 F.2d at 848.

▮ These cases have no application here. Central National has not acquiesced in the continued existence of any dangerous condition. No wrong has been done to a third party. Central National is therefore barred from recovering for breach of contract only if Devonshire can establish an express, enforceable, written release or oral discharge of the duty to purchase reinsurance. See 5A A. Corbin, Corbin on Contracts §§ 1238, 1240 (1964); 2 Restatement of Contracts § 402 (1932). While Central National did not inquire further after February 6, 1973, when it requested the necessary reinsurance certificates, mere silence is insufficient to constitute an oral discharge. Devonshire's contractual duty to procure reinsurance on the Drexelbrook project, and to indemnify Central National for its failure to do so, was not discharged by Central National's failure to follow up on the lack of reinsurance.

### Tender of Defense and Settlement

Alternatively, Devonshire contends that Central National is barred from indemnity because it failed to tender to Devonshire defense of Helmsley-Spear's claim, and because Central National in fact had a defense to that claim arising from the gross understatement of values in the insured's request for a quotation. It further contends that the settlement finally concluded was in certain respects unreasonable.

▮ An indemnitee who unilaterally settles a claim against it, without tendering defense or submitting the settlement to its indemnitor, must, in an action for indemnity, establish: (1) at least potential liability, and (2) the reasonableness of the settlement. See Parfait v. Jahncke Service, Inc.,

484 F.2d 296, 303–305 (5th Cir. 1973), *cert. denied*, 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974); *Tankrederiet Gefion A/S v. Hyman-Michaels Co.*, 406 F.2d 1039 (6th Cir. 1969). "The ultimate problem with any other rule . . . is that potentially it would allow B [the indemnitee] to spend C's [the indemnitor] money without the final judgment of a court or C's agreement." Id. at 1043.

■ This defense is not available to Devonshire, however, in view of its conduct during the course of the settlement negotiations. The District Court, in its thorough opinion, set out in detail the steps taken by Central National to inform Devonshire of every step of the negotiation process. Devonshire received copies of adjustors' reports, and Central National repeatedly called upon Devonshire to have its errors and omissions carrier participate in the negotiations. Of greatest significance, Christensen, Devonshire's vice-president, was informed in detail of the settlement terms the day after settlement was reached, and agreed that it was the "best possible loss settlement." At no time prior to this suit did Devonshire dispute either Central National's liability or the propriety of settlement. From these facts, it appears that Devonshire in fact ratified the settlement, and so cannot contest its reasonableness.

Devonshire contends that, even if it is found to have conceded Central National's liability to its insured, it is not bound by two elements of the settlement which are unreasonable.

■ First, Devonshire challenges the $160,000 settlement of the insured's claim for rents and earnings. It points to undisputed evidence that Central National's vice-president, Gordon, instructed adjustor Day to accept the insured's rents and earnings figure without audit. It contends that the unaudited nature of the rents and earnings figure was not disclosed to Christensen, so that his consent to the settlement did not extend to these figures.

Helmsley-Spear submitted worksheets showing loss of earnings of $127,347.44 and loss of rents of $112,814.29, after application of co-insurance factors. At the March 28 meeting, it was agreed that these claims would be compromised for $160,000. The compromise of a $240,000 claim for $160,000 appears reasonable. Devonshire's failure to object, even after being informed that the insured's figures were unaudited, confirms this conclusion. The findings of the District Court to this effect are not clearly erroneous.

Second, Devonshire challenges the action of Central National in making a $144,385 payment under the replacement cost endorsement to the policy. This amount was payable only if "the damaged or destroyed property is actually repaired or replaced by the insured with due diligence and dispatch." [4]

■ The fire loss occurred in October 1973. The first permit for repair was obtained by the insured in April, 1974, approximately five months after the fire. Prior to this time, it was necessary for the insured to engage an architect to draw plans for the repairs. The insured first incurred expenses for repair in April 1974; the expenses continued steadily through October of that year. It appears, therefore, that the insured began reconstruction efforts shortly after the loss and continued them steadily until repairs were completed. Central National could not have avoided its obligation under the replacement cost endorsement on the grounds of lack of diligence by the insured; Devonshire therefore cannot escape its obligation to indemnify Central National on the basis of this portion of the settlement. The District Court did not err in so holding.[5]

---

4. *See Higgins v. Insurance Co. of North America*, 256 Or. 151, 469 P.2d 766, 771–74 (1970) for a description of the purpose and effect of this kind of policy endorsement.

5. An additional claim of trial error arises from the District Court's refusal to order Central National to produce for Devonshire copies of a taped conversation between Russell McFarren and Central National's attorney. McFarren was called by both sides, but was an expert

## II.

### MEASURE OF DAMAGES

■ Both parties appeal from the District Court's computation of damages arising from Devonshire's breach of its duty to reinsure.

It has been held that the measure of damages [for breach of a contract to insure] is the amount the plaintiff would have been paid had the insurance been effected, or, at least, that the promisor is liable, within the amount of the proposed insurance, for the loss attributable to his failure to obtain insurance.

4 J. Appleman, Insurance Law & Practice § 2269 at 215–16 (1969) (footnotes omitted).

The parties and the District Court appear to agree that this general principle is applicable to the breach of a contract to purchase reinsurance; all agree that the proper measure of damages is the amount which would have been applied to the loss under reinsurance obtained as provided in the agency agreement. Each party has its own answer, however, to the key question: how much reinsurance was Devonshire required to obtain on this risk under the agency agreement?

It should be noted, at the outset, that the agreement itself is silent on the question, providing only in the addendum that "the excess over the above mentioned $500,000 limitation must be reinsured on a pro rata basis, not on an excess of loss basis, with financial [sic] sound and reputable reinsurers."

■ The addendum is not a model of clarity. The District Court by clear implication found it to be ambiguous and permitted parol evidence to aid in its construction. As a general rule an ambiguous clause is construed most strongly against the drafter, especially when the contract is one between an insurance company and its insured. In this case the contract clause was contained in an agency contract between an insurer (the drafter) and its agent. There was substantial evidence that both Central and Devonshire understood the contract clause to mean that Devonshire would not write insurance on Central's behalf which would expose Central to liability in excess of $500,000 on any one risk. The District Court so held and this holding is not clearly erroneous. Central National's expert, Joseph Barker testified that the addendum clause was intended to limit Central National's loss to $500,000 and that Devonshire was expected to place agency reinsurance on a pro rata basis to protect this objective. Clarence E. Crippen, who was a vice president of Devonshire at the time the addendum was executed, confirmed this construction when he testified the whole purpose of the Addendum to the Agency Agreement was to place upon Devonshire the burden of seeing to it that Central National Insurance Company was not exposed to any risk for more than $500,000.

It was thus established by proper construction that it was Devonshire's contractual obligation to obtain reinsurance on any one risk sufficient to limit Central National's liability to a maximum of $500,000.[6] Since no reinsurance was in fact obtained it was the District Court's responsibility to fix the amount which would have discharged that duty.

■ Devonshire contends that it could not have been under a duty to acquire more than $500,000, the difference between the estimated values of the clubhouse property at the time of the policy ($1,000,000) and $500,000. Central National, however, contends that since a blanket policy was issued, it was necessary to provide for reinsurance in a maximum amount equal to $10,780,000

witness for Devonshire. Central National used the transcripts in its examination of McFarren. We have reviewed the record and are satisfied that if any error occurred, it was harmless. The transcripts were not used by McFarren to refresh his recollection.

6. "Any one risk" did not mean the total complex insured. As the District Court stated, "The evidence leaves no doubt that in applying this term as the parties did in their course of dealing, Devonshire was obligated to reinsure only those individual risks, such as the Clubhouse, covered under the policy with values in excess of $500,000."

(the total coverage) less $500,000. It argues that if Devonshire had properly reinsured the entire project (since it was a blanket policy), Central's pro rata share of each dollar of actual loss would only be $.046 and hence it would not have reached its $500,000 maximum exposure on this particular loss. It claims indemnity for 95.4% of the loss. We think this places an unrealistic emphasis on the potential risk factor in this case. The blanket exposure of $10,780,000 has significance only to the extent that replacement values of the clubhouse were so underestimated that, because there was no co-insurance under the policy, the insurer would become liable for damages in an amount greater than that upon which the premium was based.

 The District Court found that Devonshire had breached its fiduciary duty to Central in this respect by unreasonable conduct and should be liable for not reinsuring based upon true replacement values. While this reasoning is not without force, we note that it sounds in tort and the case was not tried upon this theory. We reach the same result simply by holding that, under the facts of this case, indemnity should be limited to that amount of Central National's liability which would not have been incurred had the clubhouse been reinsured at replacement value with pro rata

insurance in excess of Central National's $500,000 limit.[7] The District Court established these amounts as follows:

| | |
|---|---|
| $1,188,867 | building |
| 160,000 | contents |
| 150,000 | gross earnings |
| 100,000 | rents |
| $1,598,867 | |

Since Central National's limit of $500,000 was 31.27214% of this amount, the District Court found that Devonshire's pro rata share of the ultimately established loss would be 68.727855%. This finding is supported by substantial evidence and is not clearly erroneous. The District Court found that additional damages compensable under the contract included a proportionate share of the loss adjustment expenses of $33,002.39, based upon customary practice in the reinsurance industry. These findings are likewise supported by substantial evidence and are not clearly erroneous.[8]

### Allowance for Premium

 The District Court held that the damages should be reduced by the portion of the premium which the reinsurer would have paid had Devonshire obtained reinsurance. The District Court applied the 68.727855% factor to the premium on the total blanket policy of $10,780,000. We think this was error. Any adjustment

7. We think the proration must, under the contract, be *applied to*, not determined by, the settlement amount. Judge Lay's approach to the measure of damages is in reality one of excess insurance (excess of $500,000). The percentages applied by him (slip op. p. 27–28) do no more in the end than say the settlement loss (exclusive of the adjustment expenses) is to be allocated, not prorated, $500,000 to Central National and the balance to Devonshire. The agreement expressly provided that reinsurance would "not [be] on an excess of loss basis." Moreover, the breach occurred when Devonshire failed to obtain proper reinsurance, a point in time at which the settlement figure could not have been determined. We do agree with Judge Lay's view that the monumental task of unscrambling the garbled contract, requiring a review of over 2400 pages of printed record, could well have been avoided had the parties given the agreement the care that the amounts at stake deserved.

8. Devonshire argues that recovery of this amount is precluded by the Agency Agreement, which provides that "the General Agent shall indemnify and hold harmless the Underwriter or any of its affiliated insurance companies from and against any claims, judgments, judgments or liabilities, including interest and reasonable costs of defense, resulting directly or indirectly" from the violation of the limitation or failure to reinsure. Relying on *Shamblen v. Great Lakes Pipe Line Co.*, 158 Neb. 752, 64 N.W.2d 728 (1954), Devonshire argues that this contract to pay certain specified damages excludes recovery for damages not listed. Unlike the contract in the *Shamblen* case, this provision of the agency agreement does not appear to be an exhaustive listing of available damages. It appears to deal only with Devonshire's duty to indemnify for liabilities owed to third persons; it does not address Devonshire's duty to compensate Central National for damages incurred on its own account as a result of the failure to reinsure.

based upon a hypothetical reduction in premium expense should be consistent with the single risk which was the subject of the loss.[9] On remand the District Court should determine the amount of premium which would have been charged to obtain equivalent coverage on the clubhouse property aggregating $1,598,867.[10] Credit in the amount of 68.727855% of such premium should be allowed.

## Prejudgment Interest

Finally, the District Court denied prejudgment interest, holding that "[t]he proper manner of calculating the damages in this case was vigorously contested and the result ultimately reached by the Court does not entirely conform to any of the various theories propounded by the parties during the pendency of this action. *See Inland Drilling Company v. Davis Oil Company,* 183 Neb. 116, 158 N.W.2d 536 (1968)." *See Lundt v. Parsons Constr. Co.,* 181 Neb. 609, 150 N.W.2d 108, 112 (1967).

▬ Under Nebraska law, "where the amount due on a contract or claim is subject to reasonable controversy and is incapable of being fixed by computation, recovery of interest may be had only from the date of the determination of the right of recovery and the amount thereof." *Wilson Concrete Co. v. A. S. Battiato Constr. Co.,* 196 Neb. 185, 241 N.W.2d 819, 821 (1976), *citing Muller Enterprises, Inc. v. Gerber,* 178 Neb. 463, 133 N.W.2d 913 (1965). Where, in contrast, the amount due on a contract claim is liquidated, prejudgment interest may be had. *Foxley Cattle Co. v. Bank of Mead,* 196 Neb. 1, 241 N.W.2d 495, 499 (1976). The key consideration is whether the claim is liquidated; in making this determination "it becomes difficult if not impossible to color match different factual situations to cover every controversy." *Wilson Concrete Co. v. A. S. Battiato Const. Co., supra,* 241 N.W.2d at 821.

9. *See* note 6, *supra.*

10. It was conceded at trial that a portion of the premium was for liability rather than property

▬ In this case, the amount due Central National turned on the proper determination of the amount of reinsurance that was required by the agency agreement. At various times in the course of the litigation, Central National itself computed this amount in three different ways. Devonshire had its own calculation. The District Court, in its final determination, arrived at a figure which had not been advanced by any of the parties.

Under the District Court's interpretation, which we have found to be proper, the amount of reinsurance was computed by reference to the replacement value of the clubhouse at the time of the policy's issuance. This value was not established until trial, and was based upon evidence adduced there. From these circumstances, we conclude that this was not a case where the amount due on the contract could be computed; rather, the amount due could only finally be determined at trial. The amount was thus unliquidated, and prejudgment interest was properly denied.

## III.

## CONCLUSION

We affirm the ultimate findings of the District Court except with respect to the amount of premium allowance that could be offset against the indemnity claim. The cause is remanded to the District Court with instructions to enter a modified judgment consistent with this opinion. Interest shall run from the date of the original judgment.

LAY, Circuit Judge, concurring and dissenting.

This is a very complex case; it arises over the ambiguity of terms used by two insurance companies in their business dealings with one another. It seems somewhat ironic to me that although the parties have

insurance and should be excluded from the computation. The District Court did not exclude the liability portion in the original judgment. It should do so on remand.

laboriously negotiated their terms, after a loss they cannot agree as to what they agreed upon. Undoubtedly the large damage amount claimed thwarts agreement and the court must make a valiant effort to decide which party will prevail. Since the parties cannot agree, they should not be surprised when judges also have differing opinions as to what they intended the legal effect of their language to be. This preamble is perhaps a futile and too often repeated plea for skilled insurance underwriters to strive to use plain and simple terms in their agreements so that the industry itself could agree as to the legal consequences of its language. It is little wonder laymen fail to understand the insurance contracts they purchase when the insurers themselves disagree. It is unfortunate that busy courts must be flooded with litigation such as this.

I do not feel the majority opinion realistically confronts the issue, nor do I feel it adequately answers the respective contentions of the parties.

The insurance policy procured by Devonshire on the Drexelbrook Apartment Complex was a "blanket" policy written for $10,780,000.[1] This covered the 90 apartment buildings, shopping center, office, signs, swimming pool and club house comprising the complex; this overall sum included separate limits extended for loss of rents, earnings and contents. The basic clause in controversy is the limitation clause in the addendum which is set forth on page 3 of the majority opinion.

The measure of damages for breach of contract is just compensation flowing from the breach. It is fundamental that this compensation should be the loss which compliance with the contract would have prevented. The issue is not, as the majority determines, how much pro rata reinsurance Devonshire should have obtained under the circumstances. The answer to this question was stipulated in the Agency Agreement, to-wit: the excess of the total sum insured on any one risk over the $500,000 limitation.

The more fundamental issue in determining defendant's liability is what pro rata sum a reinsurance carrier would have been liable for had Devonshire obtained the amount of reinsurance required by the agreement. This in turn depends on the meaning within the Agency Agreement of the clause "total sum insured on any one risk."

No one disputes that the pro rata shares of the total loss to be paid by Central National and the reinsurance carrier, according to the terms of the Agency Agreement, would be determined by dividing the total sum insured (TSI) minus $500,000 by the total sum insured:

$$\frac{(TSI - 500,000)}{TSI} = \text{total percentage to be paid by the reinsurance carrier.}$$

Central National urges that since this was a blanket policy the maximum risk on the Drexelbrook Complex was $10,780,000 regardless of the value given to any one unit insured. Therefore it urges that the reinsurer's percentage of the loss, determined by using the formula, would have been 95.5%:

$$\frac{\$10,780,000 - 500,000}{\$10,780,000} = 95.5\%.$$

Under this theory, since total loss paid was $1,267,169.39, the liability of the reinsurance carrier would be $1,210,146.75. Central National argues that that sum should now be indemnified by Devonshire by reason of its failure to obtain reinsurance. The majority opinion indicates that this would place an unrealistic emphasis on the potential risk factor. I suggest that a more accurate reason for rejecting this theory is that Central National overlooked the Agency Agreement which qualified the meaning of the "total sum insured" by the phrase *"on any one risk."* The evidence is overwhelming and both Central National and Devonshire recognize the validity of this summary by the district court:

> In the industry and between these parties the singular "risk" refers to that unit of property (be it one structure, less than one structure, or more than one structure) subject to a substantial risk of loss from the same, noncatastrophic, hazard.

---

1. This of course was an under-evaluation for the property. Nonetheless, no one could seriously urge that the total which the assured could ever collect would be $10,780,000.00.

*Central National Insurance Co. v. Devonshire Coverage Corp.*, 426 F.Supp. 7 (D.Neb., filed July 16, 1976).

Furthermore, the correspondence between the parties, as set out on page 494 of the majority opinion, clearly demonstrates that Devonshire was obligated to obtain reinsurance only on an individual risk within the complex valued at over $500,000. Under Central National's theory they would be required to pay a reinsurance premium for $10 million reinsurance on an alleged $800,000 risk. Therefore, I consider Central National's theory in this regard almost quixotic. All of Central National's inter-office memos and its correspondence with Devonshire demonstrate that this method was never seriously suggested as a possible means of determining the pro rata responsibility of the parties.

On the other hand, Devonshire urges that the court accept the undisputed testimony of Russell McFarren, Devonshire's underwriter, that under the policy issued, he would have purchased reinsurance on the club house's appraised value ($1,000,000) and therefore Devonshire would be liable for only $500,000,[2] less the cost of reinsurance. Not only is the testimony obviously self-serving and not binding on the court, it is not relevant to the terms of the Agency Agreement.

The Agency Agreement required Devonshire to procure reinsurance on a pro rata basis when "the amount of the total sum insured on any one risk exceed[s] $500,000." It is clear that the "one risk" involved here was the club house—the question not answered by the theory of either party or the majority opinion is: for what sum was the club house (the one risk) insured?

The testimony and the exhibits clearly establish that the estimated value of the one risk was $850,000 for the club house and contents, $150,000 for rents and $150,000 for business and interruption, for a total of $1,100,000. The binder issued by Devonshire to Helmsley-Spear clearly specified

these sums, and the record demonstrates that various premium computations were based on these estimates. Although these sums were the estimated values, the total sums set forth in the *blanket policy* issued were $150,000 for earnings, $1,230,000 for rents, $160,000 for contents and $9,190,000 for buildings. The parties do not dispute that under the blanket policy the insured was not limited in recovery to any sum certain for an individual risk but could recover up to the possible maximum loss set forth under the above limits. Since the Agency Agreement between Devonshire and Central National required reinsurance only on single risks valued in excess of $500,000, it would next seem necessary to examine the policy to determine the amount of insurance actually issued on the one risk here involved.

The assured elected, in January 1974, to proceed under "a replacement cost endorsement" clause in the policy which defined the coverage on the buildings in question. Since the blanket policy was open ended as to any one risk, at least to the amount of the overall coverage provided in determining the extent of pro rata liabilities of the parties, we must examine this endorsement to determine what the policy provided regarding the "total sum insured on any one risk." The endorsement was intended to provide insurance beyond the actual cost of any building, and allowed for depreciation. It expressly amended the policy to substitute the term "replacement cost" for the term "actual cash value" whenever it appeared. The *amount* of insurance provided was further limited by Clause 3 of that endorsement which reads:

3. This Company's liability for loss under this policy including this endorsement shall not exceed the smallest of the following amounts:

a. the amount of this policy applicable to the damaged or destroyed property;

b. the replacement cost of the property or any part thereof identical with such

---

**2.** A. $\dfrac{\$1,000,000 - 500,000}{\$1,000,000} = 50\%$ B. 50% of $1,000,000 = $500,000

property on the same premises and intended for the same occupancy and use;

 c. *the amount actually and necessarily expended in repairing or replacing said property or any part thereof.*

(Emphasis added).

The after the fact appraisal of the property, relied upon by the majority opinion, serves no relevant purpose in the present case.[3] It can no more limit the amount the insured may collect under the policy than can the grossly undervalued appraisal of the club house set forth in the binder when the policy was issued. The majority opinion uses an appraised value since it feels the intent of the parties to limit Central National's liability to $500,000 cannot otherwise be met.[4] This attempts to rewrite the Agency Agreement. In doing so my brothers confuse a blanket policy with a scheduled policy. *See Reliance Ins. Co. v. Orleans Parish School Bd.*, 322 F.2d 803, 806 (5th Cir. 1963). A blanket policy "insures property collectively without providing . . . for a distribution of the insurance to each item." *Id.* The present agreement required reinsurance only to the extent that the total sum of liability for risk assured exceeded $500,000.00. Thus, the only proper method of determining the pro rata formula clause of the Agency Agreement is to determine the actual amount insured on a given risk within the policy itself. The total sum of *any one risk* insured *under a blanket policy* must necessarily be "the amount actually and necessarily expended

in repairing or replacing said property or any part thereof," specified in Clause 3 above.

The agreement should be construed as written.

The proper figure to be used in the formula should be determined from the following amounts paid by Central National to the insured in settlement of its claim:

$ 778,782 – for the club house

 144,385 – for depreciation due under replacement cost endorsement

 160,000 – for loss of rents and earnings

 <u>160,000</u> – for contents

$1,243,167 – total.

Thus, under the Agency Agreement, as set forth by the policy, the total sum insured for the risk involved here was $1,243,167.

The formula to determine the pro rata share under the contract would be:

$$\frac{\$1,243,167 - 500,000}{\$1,243,167} = 59.78\%.$$

The loan adjustment expense of $33,002.39 should not be part of the formula but can be prorated pursuant to the percentage arrived at in the formula. Thus, the total damage collectible by Central National should be 59.78% of ($1,243,167 + 33,002.39) or $762,894.

Thus, I conclude judgment should be entered for this amount, after proper allowance of premium. I concur in the majority opinion's disposition of the remaining issues.[5]

---

**3.** It could have perhaps triggered, as Central National early recognized, a possible defense for misrepresentation based upon the lower valuation declared. This defense was early abandoned by Central National in the settlement of the insured's claim. It is of course useful initially to compute the average insurance premium. *Reliance Ins. Co. v. Orleans Parish School Bd.*, 322 F.2d 803, 807 (5th Cir. 1963). Declared value is also necessary for the purpose of determining the insured is in compliance with a 90% co-insurance clause (not applicable here). *Ibid.*

**4.** This is not necessarily true. Not every initial appraisal would be prognastic as to actual cost of replacement and *under a blanket policy* "the total sum insured on any one risk" could well

exceed the initial appraised value thus requiring Central National to pay more than the $500,000.

**5.** The majority suggestion that the applied formula results in excess rather than pro rata insurance is a non sequitur. The application of the formula itself disputes this. I think the essential difficulty in applying the formula in the given case is that the parties are attempting to use principles governing pro rata insurance to a blanket policy rather than to a scheduled policy. When this is done it is obvious that nothing but confusion can result and we are put to sea in a quagmire of conflicting legal principles.